## PRUDENTIAL INS. CO. OF AMERICA v. SAXE.
## SAXE v. SAME.
### Nos. 7824, 7825.

United States Court of Appeals for the District of Columbia.

Decided Jan. 25. 1943.

Writ of Certiorari Denied May 3, 1943.

See 63 S.Ct. 1033, 87 L.Ed. ——.

Mr. Arthur P. Drury, with whom Messrs. Benjamin S. Minor, John M. Lynham, and John E. Powell, all of Washington, D. C., were on the brief, for appellant in No. 7824.

Mr. Maurice Friedman, with whom Mr. Harry Friedman, both of Washington, D. C., was on the brief, for appellant in No. 7825.

Mr. Sidney V. Smith, of Washington, D. C., for appellee in each case.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

This is a three-cornered contest on a policy of life insurance, involving the insurer, the mother and the wife of the insured, Alexander T. Saxe. His wife Jane Saxe, now Mrs. Ross, was the original beneficiary and recovered judgment on the policy after a jury trial. She remarried about a year and a half after Saxe's death. His mother, Gertrude T. Saxe, intervened, claiming the proceeds, or half of them, by virtue of alleged changes, shortly before her son's death, making her beneficiary. The insurance company hereafter called Prudential or the insurer, contests liability to either claimant. It and the mother appeal.

Apart from whether the attempted changes of beneficiary were effective, the principal issues arise on the insurer's contentions that (1) the policy never took effect for failure to comply with "conditions precedent"; (2) if it did, it was avoided by claimed misrepresentations in the application; and (3) there was no waiver of any right to avoid it by acceptance of premiums, as the claimants assert, after having notice of the grounds for avoidance. Prudential also relies upon asserted procedural errors, including admission and exclusion of evidence, consolidation of this cause for trial with its own previous suit in equity to cancel the policy, and the court's refusal to try the so-called equitable issues relating to cancellation separately before submitting the case for trial at law by a jury. For reasons to be stated, there was no error in consolidating the causes or in refusing to try the equitable issues first. We turn therefore to the substantive issues affecting the insurer's liability, first stating the evidence relating to them.

I. The insured came to Washington in the fall of 1934. Previously he had resided with his mother in New York City, where he was an architect and a teacher in Columbia University. His firm also did some work in Boston. He lived in Washington from 1934 until his death on January 30, 1938, at the age of thirty-nine. He married Jane Saxe in May, 1936. He was not then employed, though previously and later he worked for the Government. For some months his wife's earnings supported them. Partly for this reason he applied for the policy in November, 1936. It was issued the following December. His wife was the sole beneficiary. She paid the premiums until his death.

The examining physician found him in excellent health. Both before the policy was issued and afterward, until the fall of 1937, he led a very active life and, for one of his age, had an unusual interest in athletics. In the baseball seasons of 1935 and 1936 he pitched, on an average, two games a week for Government teams. There was evidence that for years he "had thorough examinations and had always been told he was in splendid condition." In March, 1937, he began to have severe occipital headaches, and the following September consulted a physician who advised him to stop playing baseball because of high blood pressure. He contracted influenza in October, went to Florida for a few weeks during which his abdomen became swollen, and on returning to Washington entered Garfield Hospital because of this condition. Dr. Pope, the resident physician who testified to these

facts from the patient's history, stated he was then in a dying condition.

However, he lived for more than a month. He was visited by both his wife and his mother, but at separate times. The latter had come to Washington from New York to visit them in November. She remained here until her son's death. She had opposed his marriage, and frequently upbraided him for it, even while in his home. On January 19, against physicians' advice and only after being required to sign a waiver of responsibility, the mother removed the insured from the hospital to an apartment, where he died eleven days later. During that period she excluded his wife from the apartment. Before taking him from the hospital she secured his signature to a paper purporting to make her beneficiary of half the insurance. After the removal and within a day or two of his death, he signed another making her sole beneficiary. Neither change was endorsed on the policy, which remained in the wife's possession.

The record presents conflicting evidence as to the cause of death. The official death certificate gives it as chronic nephritis, a kidney disease, of ten years' duration. Dr. Hulburt, who signed it, attended the insured during the last eleven days of his illness. He also signed a "physician's statement," as part of the mother's proofs of loss, stating the immediate cause as chronic glomerulonephritis of "at least 10 years" existence, with acute pericarditis of three weeks' duration as a contributing cause. Dr. Pope, resident physician at Garfield Hospital while the insured was there, testified he was "a desperately ill man during the entire time," suffering in the witness' opinion from malignant hypertension. This he described as "a serious condition in which the blood pressure is very high * * * usually a fatal condition * * *, accompanied by degeneration of the arteries, * * * heart, kidney or brain failure * * * a progressive proposition and becomes worse and worse very rapidly."

With a pathologist from the hospital, Dr. Pope performed an autopsy with the findings, in brief, a heart with pericarditis; liver with moderate fatty and granular degeneration with congestion diagnosed as hepatitis; splenitis; kidney diagnosed as having nephrosclerosis with marked interstitial fibrosis (hardening with malignant hypertension). From his observation of the patient, autopsy findings, and general experience, Dr. Pope's opinion was that the insured died of "malignant hypertension, or nephrosclerosis, with uremic poisoning, and that connected to the pericarditis * * *." In his best judgment the condition had existed for "a year, or possibly less." Because of its importance, later to be shown, we mention now that Dr. Pope found no evidence of duodenal ulcer in the illness or the results of the autopsy, nor so far as appears was evidence of such an affliction found by Dr. Hulburt.

II. The foregoing statement of facts is made as background for setting forth the more crucial and controverted ones relating directly to the issues affecting the alleged misrepresentations. These consisted in answers to questions in the application. They fall generally in two groups, (1) denials of having consulted physicians for three years and of having ever been in a hospital for observation, diagnosis, rest or treatment; (2) denials of having or of having had certain diseases or afflictions, specifically including abnormal blood pressure, dizziness, kidney disease, duodenal ulcer, etc. The questions, with the answers, are set forth in the margin.[1]

The insurer assigns each of these answers separately as ground for relief, contending they were false and for that reason the policy did not attach, or were both false and material to the risk or its acceptance, so as to avoid the insurance. The evidence concerning the answers differs somewhat, but in the main they may be treated together, since the alleged falsity of the statements, both as to the existence of disease and as to hospitalization and con-

---

[1] "6D Have you ever been in a hospital, sanitarium, or other institution for observation, diagnosis, rest or treatment? (Answer) No.

"7A Have you ever had * * * abnormal blood pressure? (If yes, give particulars including treatment in space below.) (Answer) No.

"9A Have you consulted, or been attended by a physician or other practitioner during the past three years? Give dates, complaints, doctors' or practitioners' names and addresses. (Answer) No.

"10A Have you ever had—(Answer Yes or No). Disease of kidneys (Answer) No. Dizziness—loss of consciousness (Answer) No. Gastric or duodenal ulcers (Answer) No."

sultation, grows out of a single episode the insured failed to mention. This was that he spent fifteen days, January 15–30, 1934, in Beth Israel Hospital in Boston. Appellee correctly says this was "the focal point of the misrepresentations alleged by the insurer." That is true because the only evidence the insured consulted physicians within the crucial period or had had the diseases denied is derived from the Beth Israel incident, with the single exception that Dr. Hulburt assigned the cause of death as kidney disease of ten years' duration.

It remains to state the leading facts concerning this incident, the failure of the insured to disclose it, the manner in which it was brought to light, and the communication of the facts to the insurer. There is no dispute that the insured was "in" the hospital for the two weeks. But there is a square clash on the reason and purpose of his being there and their consequences for the insurer's liability. The evidence, and the conflict, are crucial both for the issues concerning the alleged misrepresentations and their effects and also for the claimed waiver.

On the one hand is Prudential's evidence that the insured entered the hospital and remained there two weeks. It presented the hospital's records showing the history on admission, the report of the physical examination, a progress report, the results of X-ray films, a discharge note, and a diagnosis of duodenal ulcer.

The history mentions chronic stomach trouble following meals for eighteen years, relieved at once by bicarbonate of soda; two episodes of dizziness, faintness, and vomiting of black material, in the later case streaked with blood and followed by black stools. One of these occurred six years, the other one week before admission. Neither attack prevented the insured from "continuing with his activities."

Without giving details the report of the physical examination confirms its general conclusion: "P. E. is essentially negative." A layman reading the succession of negative findings gets the impression that the patient had nothing more than stomachache, perhaps a severe attack, though the report says his "abdominal discomfort is never severe enough to be called pain." It concludes with the "impression" of the examining physician, Dr. Fine: "Bleeding peptic ulcer." On January 23 another report gives the temperature, pulse and respiration as normal at all times for a week;

abdominal pain disappearing entirely after addition of atropine "to the regime"—no evidence of bleeding at any time. The discharge note summarizes the results of the physical examination, repeating the succession of negative findings, including the abdomen, urine, stool, Wasserman, Kahn and Hinton. Because of the suspicion of ulcer, Xrays had been taken of the abdomen. The results of these, together with the diagnosis, were stated as follows:

"X-rays: G. I. series showed a duodenal cap which appeared regular and showed some narrowing at the junction of the second portion. There were same calcified shadows possibly due to calcified mesentary glands opposite the third lumbar vertebrae on the left. There were also some indefinite dense shadows over lying the pelvis of the left kidney which might possibly be due to renal stones. Plain films of the gall bladder showed no stones. Re-examination of the K. U. B. was negative.

"Cl. Course: After a 16 days stay in the hospital, the patient maintained a normal T P and R thruout, the B. P. on admission was 150/90 and then gradually came down to 130/85. On a sippy regime with powders and atropine, all the patient's symptoms disappeared and he was entirely symptom-free during the entire stay in the hospital. Discharged with orders to follow a fourth stage gastric diet * * *, to remain at home with C and B and lavatory privileges for two weeks, after which time he is to see Dr. Fine.

Edward Budnitz

"Admitted: 1/16/34
"Discharged: 1/30/34
"Condition: Improved
"Diagnoses: Duodenal Ulcer
"H. L. Naterman"

Dr. Fine testified, for Prudential, under deposition procedure. He said his tentative diagnosis was bleeding duodenal ulcer; and that Saxe was in fact suffering from duodenal ulcer. He stated there was no evidence of glomerulonephritis or any other kind of kidney disease when the insured was at Beth Israel. On cross-examination he admitted the insured's icteric index, which was 17.5 on admission, was inconsistent with the diagnosis of duodenal ulcer.

Dr. Hausheer, Prudential's assistant medical director, said the Beth Israel X-ray films "indicate that there is a stricture between the duodenal cap * * * following that * * * there is a narrowing, in my opinion, that might be interpreted as a

former scar or former ulcer, that had temporarily healed * * *. In fairness, I think I could say you should get different opinions regarding that, but taking the history in the case and the record of the hospital I think one would be justified in concluding that the diagnosis of duodenal ulcer was correct."

This evidence for Prudential makes out a case of genuine hospitalization, and in the absence of other evidence would be sufficient to establish the insured then had duodenal ulcer, notwithstanding the obvious weakness of the records and the testimony, apart from Dr. Fine's, in support of the diagnosis, including the records' admitted inconsistency with it in some respects.

There is medical evidence for the appellee which flatly contradicts the diagnosis on the basis of the details given in the hospital records as well as by the insured's subsequent health and medical experience. But before that is set forth, other evidence will be stated which gives an entirely different version of the Beth Israel incident. It is, in short, to the effect that this was not genuine hospitalization, but was really a fictitious one for two purposes, to cover up an alleged "social lapse" of the insured caused by overdrinking at a wedding party and thereby explain or excuse his absence from his classes, and at the same time to complete the work he was doing as an architect for Dr. Fine on a house he was then building in Boston.

This version of the Beth Israel matter came to light as a result of Gertrude Saxe's efforts to force or induce her son to make her his beneficiary, in December, 1937, and January, 1938. It appears in the evidence from the testimony of Jane Saxe and her friend, Mrs. Kavanagh, concerning a conversation between the insured and his wife at Garfield Hospital the night of December 29, 1937. This led to an interview between Jane Saxe and Mr. Brine, Prudential's Washington representative, which is important on the waiver issue. Appellee's brief summarizes the evidence in her behalf in these respects as follows:

"On December 29, 1937, the insured told his wife * * * that his mother had brought the Beth Israel incident to his mind and that he had forgotten to include it on his application for the policy. He also told her that there had been nothing wrong with him at the Beth Israel Hospital but that on the week-end when he entered the hospital he had been on a wedding party with his business partners in Boston and Dr. Fine, a surgeon for whom they were building a house; that he had some drinks on this party and as he was not a drinking man the drinks had affected him; that his companions did not think he should take the train back to New York in that condition and as he had no residence in Boston, Dr. Fine suggested that he go to the Beth Israel Hospital, where Dr. Fine was on the staff. Insured said that that would give him an excuse for missing his classes at Columbia University where he had a record of not missing any classes in the years he had been on the faculty and that Dr. Fine agreed to fix up a record that would make it look as if he were really sick. He also said that he stayed at the hospital for two weeks because he was interested in a nurse there and that he conducted his Boston architectural business from the hospital room during his stay.

"He told his wife to inform the insurer of this and find out if his failure to disclose it in the application had any effect on the policy. His wife that night called Mr. Moore, the insurer's agent who had sold them the policy and told him what her husband had said. Mr. Moore told Jane Saxe that the matter was one which his superior, Mr. Brine, would have to handle and he arranged an appointment for her with Mr. Brine for the next day. Jane Saxe and an old friend of the family, Mrs. Blanche Kavanagh, called on Mr. J. Howard Brine, Washington Superintendent of the insurer, on December 30, 1937. Jane Saxe told Mr. Brine all that the insured had told her about his prior hospitalization and asked whether she should continue to pay premiums on the policy as she would have to borrow money to do so. Mr. Brine asked her and also Mrs. Kavanagh how long they had known the insured and what his health had been during the time they had known him. They told him that they had known insured since he came to Washington in 1934 and that his health had been good. Mr. Brine told them that the insurer's doctor would not pass a man for $10,000 of insurance unless he were in good health, that a man might be in a hospital for any number of reasons which would not affect the policy and that the failure to disclose the Beth Israel hospitalization would not affect the policy and that Jane Saxe should continue paying the premiums. This conversation was corroborated by Mrs.

Kavanagh. Jane Saxe also testified that Mr. Brine asked her about the insured's then condition and she told him that the insured was in Garfield Hospital and that he thought he was going to die.

"Mr. Brine * * * admitted that Jane Saxe and Mrs. Kavanagh had called on him in December, 1937, but denied that anything had been said about the Beth Israel hospitalization. He admitted on cross-examination that he might have forgotten that part of the conversation. Mr. Moore admitted the telephone call of Jane Saxe on the preceding night and that he had made the appointment with Mr. Brine but denied that anything had been said about the hospitalization.

"Jane Saxe borrowed money from her sister and paid three premiums between the time of this interview and the death of the insured. The appellant accepted these payments and issued formal receipts for them."

The occasion for the insured's disclosure of the Beth Israel matter to his wife appears from her testimony and Mrs. Kavanagh's that he said his mother had "been hounding me all day to change my insurance over to her" and threatening, if he did not, to disclose the Beth Israel episode and bring down the nurse to testify about it, presumably in order to defeat the wife's recovery. Mrs. Kavanagh was present at both conversations and confirms Jane Saxe's testimony concerning them in all material respects, including those denied by Mr. Brine. There was evidence that the insured carried on his work as architect all during the period he was in the hospital, and that he told his wife the reason he had not disclosed the incident in the application was, in one instance, that he had forgotten it, in another, "because he hadn't thought it important."

The medical evidence sustaining appellee's version of the Boston incident is found largely in Dr. Pope's testimony, and in the inconsistency between the Beth Israel records and diagnosis which he points out. The X-ray films were made through a gastrointestinal series. That is the chemical passage of an opaque medium, such as barium or bismuth, that can be watched with a fluoroscope. Dr. Pope testified, for appellee, that the laboratory data did not sustain the diagnosis of duodenal ulcer, though the staff members were correct in suspecting it on admission. He gave as reasons that "at numerous places in this record

notation was made by several different men that general physical examination was negative. The abdominal examination showed no tenderness. There were no masses * * * from the history the stools had become normal. * * * On admittance * * * the admitting physician said the examination was negative except for pallor * * * this patient's temperature, pulse and respiration have remained normal at all times. * * * The duodenal cap appeared regular and showed some narrowing at its junction with the second portion—which is not indicative of duodenal ulcer. They went on this, which revealed nothing except a re-examination of the kidney and bladder, which was done and negative, and my feeling, speaking of duodenal ulcer, is that if the operator of the machine, if the X-rayman had been suspicious at all he would have repeated that. * * * Now, they did not do any gastric analysis and, in my opinion, a man who is suspected a week ago of maybe having some bleeding, of having duodenal ulcer, and whose stool examination shows no presence of blood even by the most minute chemical test, and whose gastric series with the fluorscope is negative, *I say you have proved that man had not an ulcer,* and I can't see it any other way, especially with his repeated normal physical examination * * * and there is another thing in this record on physical examination which does not bear out an ulcer, which is a careful eye-ground examination. That is a deep retinal examination. * * * (Italics supplied.)

Dr. Pope's view that the results of the Beth Israel examinations, as they were stated in the hospital records, could not sustain the diagnosis of duodenal ulcer, and in fact show the insured did not have one, derives support from other facts already stated: the insured's apparent good health both before and after he went to the hospital and his active participation in athletics through the summer of 1937, over four years later; the absence of any evidence of such an ulcer in the medical examination for the insurance, the autopsy, and the assigned causes of death; the fact that the examiner found him in excellent health and classed him as a first-class risk a little less than two years after the Boston diagnosis; and finally from the very tentative nature of Dr. Hausheer's conclusion that duodenal ulcer could have been found, though "tem-

porarily healed," and his concession that "diffcrent opinions" should be secured on the Beth Israel records.

All these things go strongly to prove the insured did not have duodenal ulcer, and to contradict Dr. Fine's opposite conclusion. He was interested, in the sense that appellee's version of the Beth Israel episode, if true, called in question his professional ethics. Dr. Hausheer also was interested by virtue of his position. He went as far as he could honestly in his employer's defense, though that was not very far. Dr. Pope, though testifying for appellee, is not disclosed as having any interest.

With the medical evidence in this condition, appellee's version of the nature and purpose of the insured's admission and stay at Beth Israel takes on a verity it would not have if the hospital records and the medical testimony more strongly supported the insurer's version. Taking account of all the evidence in her behalf, we cannot regard it as inherently incredible, and for that reason improper for submission to the jury.

■ The result is that the evidence is not only squarely in conflict, but substantially so, whether the Beth Israel hospitalization was genuine or fictitious. This affects nearly every issue in the case. On one side is a theory of real hospitalization, for observation, diagnosis and treatment, backed by diagnosis of serious affliction, duodenal ulcer, and evidence that it existed legally sufficient to submit to the jury though not, by more than a scintilla, that it was the cause of death or existed when death occurred. On the other is a theory at most of recuperation from overindulgence in alcohol, without other than temporary if perhaps somewhat abnormal effects; or, of even less importance for insurance, of purely fictitious hospitalization for the sole purposes of supplying an apparently genuine but actually false medical record of illness, for use as an excuse for the insured's failure to meet his classes, and at the same time to secure freedom from them and his other work in order to complete his task for Dr. Fine.

In the light of this fundamental evidentiary conflict, we turn to the major issues. The insurer says the statements were false and therefore (1) under the terms of the application the policy never took effect; (2) if it did become operative, it was voidable by the insurer. It is argued, under the first, that the application required the statements to be true in fact, regardless of the insured's knowledge or intent and, apparently, of whether they were material; under the second, that the statements either were made with intent to deceive or materially affected the acceptance of the risk or the hazard assumed, so as to make the policy voidable under Section 35—414, D.C.Code (1940).

That section is pertinent to both arguments. It is: "The falsity of a statement in the application for any policy of insurance shall not bar the right to recovery thereunder unless such false statement was made *with intent to deceive* or unless it *materially affected* either the *acceptance of the risk* or *the hazard assumed* by the company." (Italics supplied.)

III. The argument that the policy did not take effect rests upon the following provision of the application: "I hereby declare that all the statements and answers to the above questions are complete and true, and I agree that the foregoing, together with this declaration, as well as the statements and answers made or to be made to the Company's Medical Examiner * * * shall constitute the application and become a part of the contract of insurance hereby applied for. I further agree that the policy herein applied for shall be accepted subject to the privileges and provisions therein contained, and that unless the full first premium is paid by me at the time of making this application, *the policy shall not take effect until issued by the Company and received by me and the full first premium thereon is paid, while my health, habits, occupation and any other conditions of fact, material to the risk, represented by statements in the application, remain the same as described therein.* * * *" (Italics supplied.)

■ Since the full first premium was not paid at the time of making the application, Prudential insists this clause made the truth of the statements "conditions precedent to attaching of the risk," and that they were not fulfilled because the statements were not true in fact. In this view it would be immaterial whether the insured knew they were contrary to fact or intended them to deceive, or whether they were material to the risk or its acceptance. An entirely innocent misstatement, whether or not material, would keep the policy from taking effect. This, in substance,

would make the statements warranties.[2] It also would nullify the intended effect of Section 35—414. That section, at the very least, was intended to prevent innocent and immaterial misrepresentations in the application from avoiding the insurance, and its effect cannot be escaped by the device of contracting to the contrary or labelling a contractual attempt to do this a "condition precedent" to attaching of the risk.[3] The very purpose of the section was to nullify contractual provisions contrary to its terms and effect. If therefore the so-called "condition precedent" is by its terms more broadly effective than the statute allows, to that extent it is invalid.[4]

In this phase of the case the insurer relies upon Mutual Trust Life Ins. Co. v. Ossen, 2 Cir., 1935, 77 F.2d 317; Silverman v. New York Life Insurance Co., 1935, 65 App.D.C. 29, 79 F.2d 154; Kaplan v. Manhattan Life Insurance Co., 1939, 71 App.D.C. 250, 109 F.2d 463; New York Life Insurance Co. v. Wertheimer, D.C. N.D.Ohio 1920, 272 F. 730; Benzinger v. Prudential Insurance Co., 1935, 317 Pa. 561, 176 A. 922. The Ossen case appears to support Prudential's view, contrary, we think, to the explicit terms and intent of the statute. The basis for our ruling in the Silverman case was that an agent had no authority to extend the time for paying the first premium, which was a condition precedent to the policy's taking effect, and is therefore clearly distinguishable on the facts. It hardly need be noted that payment of the premium is not covered by Section 35—414. Nor was the section applicable to the policy in that case. A dictum, in the Kaplan case, which cites the Ossen case is susceptible of interpretation in appellant's support, but the cause was reversed because the trial court excluded evidence that the insured had no knowledge, when he made the application, of the existence of the cancer when he answered he did not have it. The case, therefore, notwithstanding the dictum, lends no support to Prudential's position. The other cases are distinguishable, by the absence of a statute similar to Section 35—414 or on the facts.

■ IV. To avoid the policy under the statute the statements must be both false and made with intent to deceive or material to the risk or its acceptance, unless possibly both intent to deceive and materiality are required in addition to falsity, a matter which need not be decided in this case. Whether a statement is false, made with deceitful intent or material in the statutory sense may be questions of law or of fact, depending on the circumstances. Prudential insists the answers in this case were false and material as a matter of law. Appellee says the issues were properly questions of fact, so treated by the court, and resolved in her favor on legally sufficient evidence.

The short answer which might be made to the insurer is that on the evidence presented the falsity of all the answers was a question of fact and the jury has resolved this issue in each instance, on legally sufficient evidence, against it. This would be on the broad basis that the verdict has determined, in accordance with appellee's contention and the evidence supporting it, that the entire matter, including the records, of the Beth Israel hospitalization was fictitious, not genuine; and consequently there was neither hospitalization nor consultation and attendance by physicians within the meaning of Questions 6D and 9A. The verdict, in this view, determined that the evidence was not credible that the specified diseases had existed, or that the insured knew or believed they had, or misstated these things in any respect. On this view, none of the answers was false, and

---

[2] We are aware of the technical difference between warranties or representations and conditions precedent. See Rugg, J., in Everson v. General Fire & Life Assurance Corp., 1909, 202 Mass. 169, 88 N.E. 658, 660; 3 Williston, Contracts (1936) § 673; Vance, Insurance (1930) § 115.

[3] See, e.g., Mutual Life Insurance Co. v. Mandelbaum, 1922, 207 Ala. 234, 92 So. 440, 29 A.L.R. 649; Salts v. Prudential Insurance Co., 1909, 140 Mo.App. 142, 120 S.W. 714; Lynch v. Prudential Insurance Co., 1910, 150 Mo.App. 461, 131 S.W. 145; Schmidt v. Prudential Insurance Co., 1933, 190 Minn. 239, 251 N.W. 683, 685. Contra: Mutual Trust Life Ins. Co. v. Ossen, 2 Cir., 1935, 77 F.2d 317, 320; Barker v. Metropolitan Life Insurance Co., 1905, 188 Mass. 542, 74 N.E. 945; Lopardi v. John Hancock Mutual Life Insurance Co., 1935 289 Mass. 492, 194 N.E. 706; Metropolitan Life Insurance Co. v. Howle, 1900, 62 Ohio St. 204, 56 N.E. 908; Prahm v. Prudential Insurance Co., 1923, 99 N. J.L. 288, 122 A. 752.

[4] Stephens v. Metropolitan Life Insurance Co., 1915, 190 Mo.App. 673, 176 S. W. 253, 254.

without this there is no ground for avoiding the policy under the statute.

If, however, a less sweeping view of the verdict's effect is taken, so that it is not considered as determining that the Beth Israel hospitalization was fictitious to the extent the records were made up by Dr. Fine entirely without any foundation in actual diagnosis or treatment, the case is not much better for the insurer on the falsity of the answers concerning the existence of specific diseases or afflictions. Upon all the medical evidence, including the Beth Israel records, the falsity of each of these answers was a question of fact, except in the instances to be noted in which the evidence would not sustain a finding for the insurer; there was legally sufficient evidence to sustain a finding the insured was never afflicted as the questions specified, prior to the application or his last illness; and the jury has resolved these issues in appellee's favor.

Thus, the insurer did not prove, to the jury's satisfaction, that the insured ever had duodenal ulcer. The evidence concerning this has been stated and clearly sustains the finding, implicit in the verdict, that the insured never had this affliction, either in fact or to his knowledge or belief, when he made the answer or, for that matter afterward.

The same thing may be said concerning each of the other denials of specific affliction, except that in some instances the evidence was not sufficient to sustain a finding that it had existed. Thus, the only evidence to show "abnormal blood pressure" was that the insured's blood pressure was elevated to 150/90 and 160/110 (systolic and diastolic) on the first two days at Beth Israel. The evidence showed it could not have been elevated for long previously, fell to 135/100 on the second day, and remained at the normal of 135/85, for a man of the insured's age and build, during the remaining fifteen days. It was 135/98-92 when he was examined for the policy, which the examiner first said was less than normal, then only "slightly elevated." Dr. Pope gave the cause of death as malignant hypertension, "in which the blood pressure is very high," but in his best judgment this illness existed only a year, or possibly less.

"Abnormal" would seem to mean something more than a temporary rise, no greater than this, for only two days in a period of several years. There is no evidence the insured ever knew what any of the readings disclosed. It is at least doubtful whether this evidence was legally sufficient to sustain a finding of falsity. But whether so or not, it was clearly sufficient to sustain the contrary one, the verdict has decided the question against the insurer, and there is no basis for setting it aside.

Question 10A inquired about kidney disease, dizziness—loss of consciousness, and gastric ulcers, in addition to duodenal ulcer. The Beth Israel records show, in relation to "dizziness—loss of consciousness," two attacks of "sudden weakness, faintness, vomiting of black material," one six years before admission which lasted "but a few hours after which he recovered and felt as usual," the other a week before admission when the patient, en route by train to New York, "began to experience hot and cold sweats of the head and seemed to shake all over inside. He soon began to feel very weak and faint and everything seemed to sway before him." The history also stated, "He felt somewhat dizzy the day before admission." In substance all this evidence shows, taken at face value, is that twice or three times in nearly ten years, the last one nearly three years before the answer was made, the insured felt weak and faint and somewhat dizzy. There was no evidence of fainting or loss of consciousness. The question couples "dizziness—loss of consciousness" together. If this means, as it may, "dizziness to the extent of losing consciousness," there is no evidence it ever existed, and the answer was not false as a matter of law. If it means dizziness without fainting, we think it should be ruled as a matter of law that the answers were not material to the risk, nor were they false in the absence of evidence to show that these occasional, infrequent and long-past spells were present in the mind of the insured when he answered. Something more than two or three dizzy spells scattered over ten years should be required to avoid insurance. But if the falsity and materiality on this evidence are to be regarded as issues of fact, again the verdict has settled them in favor of appellee.

The only evidence the insured had kidney disease prior to the application was in the official death certificate and the physician's statement filed with the proofs of loss, both signed by Dr. Hulburt. This was that the cause of death was chronic nephritis or glomerulonephritis of at least ten years' duration. This evidence and diagnosis were contradicted in many ways. Dr.

Krause found no evidence of nephritis or kidney disease when he examined the insured for Prudential, fourteen months before his death. Dr. Fine testified there was no evidence of glomerulonephritis when the insured was at Beth Israel. Dr. Pope found nephrosclerosis, hardening of the kidney, present in the last illness, but in his view the cause of death was malignant hypertension, a rapidly progressing condition of not more than a year's duration. The mere statement of this evidence shows sufficiently that the issue concerning this answer was for the jury. The evidence was clearly sufficient to sustain a finding the insured never had, or believed that he had, kidney disease prior to the application.

■■ In summary the insurer charged that the insured, prior to his application, had had duodenal ulcer, abnormal blood pressure, dizziness—loss of consciousness, kidney disease, and that his answers denying their existence were false. To avoid the policy for material misrepresentation, on account of these answers, the insurer had the burden of proving one or more of them false and this required showing he had had the disease. The proof was clearly against it as to all these illnesses or afflictions. The clear weight of the evidence showed the insured never had duodenal ulcer, and that he did not have kidney disease until his last illness, a very considerable time after the policy was issued. On the other matters, the best the insurer could do was to prove two or three dizzy spells, accompanied by vomiting, and elevated blood pressure for two days after the last one. Few people go through ten years without more illness than this. The medical evidence, viewed as a whole, weighed heavily for the appellee. The insurer's case was intended to tie up the alleged afflictions existing in 1934 at Beth Israel or previously with the insured's general collapse four years later, presumably as a progressive evolution of the former into the latter, notwithstanding the contradicting facts that for more than three of the four years he continued his strenuous athletic activities, was passed as an "excellent risk" by the medical examiner fourteen months before he died, and there is no evidence of any illness or symptoms from the time of the Beth Israel episode to the spring preceding his death when the occipital headaches began. On the other side, the evidence for appellee strongly supported the view that the insured enjoyed unusual health and vigor until the last year of his life and within that year his fatal affliction developed, at first slowly, then with rapid and irresistible progress. Whether, therefore, the alleged afflictions are viewed separately as distinct illnesses or collectively as factors contributing to a single general condition, the case for the insurer on the medical evidence was hardly convincing. At any rate it was not sufficient to overcome the weight of proof in favor of the appellee.

The answers to Questions 6D and 9A present somewhat different problems. The former denied having "ever been in a hospital, sanitarium, or other institution *for observation, diagnosis, rest or treatment,*" (Italics supplied) and the latter having consulted or been attended by physicians within three years.

As has been said, if the jury believed that the Beth Israel hospitalization was wholly fictitious, including the hospital records, it could find these answers were not false in fact. In that case, there was no real hospitalization, "for observation, diagnosis, rest or treatment," and the insured did not consult, nor was he attended by physicians.

But, if the questions are not taken so narrowly, and the verdict is not regarded as deciding that there really were no examinations or actual medical consultations, the answers were false in the sense of being contrary to fact. The insured was "in" the hospital, for two weeks. There were therefore misstatements of fact. Whether, on this view, they would give grounds for avoiding the policy under Section 35—414, would depend on whether they were made with intent to deceive, were material to the risk or its acceptance, and possibly whether they were false to the knowledge of the insured.

■ The evidence was sufficient to sustain a finding there was no intent to deceive. Apart from the proof the insured had none of the afflictions Prudential claimed, this is found in his statements he had forgotten the Beth Israel matter or considered it of no importance when he answered the questions. These statements are not necessarily inconsistent, if it is believed he went to Beth Israel, as he said, not because he was really ill, but to cover up his "social lapse." It was the sort of thing one would better mention to the examiner but a layman, as to law and insurance, easily might fail to call the incident to mind or, if it came, regard it as entirely irrelevant to insurance. The insured's dis-

closure to his wife and request that she see the company about the effect of the omission on the insurance came, not from any fear or consciousness of intentional or fraudulent concealment, but as a result of his mother's hounding him to make her the beneficiary and threatening to make trouble for the wife over the Beth Israel affair. These things coupled with his vigorous health and athletic activities, as disclosed by appellee's evidence, from early in 1934, when he was at Beth Israel, to the fall of 1936, when he answered and signed the application blank, made a substantial case for the jury that the misstatements were not made with intent to deceive, as against the evidence for the insurer from which the contrary might have been inferred.

All this goes to show also that the insured did not make the statements falsely with knowledge of that fact at the time of the application. While he must have known he had been at Beth Israel, it does not follow this was present in his mind, or that he knowingly or intentionally spoke falsely, when he made the answers. This raises the question whether a statement to be false within the statute's meaning must be made with consciousness that it is so. If all the statute requires is that the answers be made bona fide, as would seem reasonable especially in view of the requirement that there be intent to deceive, the question whether these answers were false was for the jury. The statements were not false, as a matter of law, except merely in the sense of being contrary to fact.

■ Prudential claims the statements not only were false, but were material both to acceptance of the risk and the hazard assumed, as a matter of law. As it turns out, they were not material to the hazard assumed. Prudential has not proved that any of the afflictions inquired about contributed to the loss. Nor has it shown that the hospitalization or consultations affected the risk or the loss in any way. A misstatement to be material to the hazard assumed must be shown in some way to have affected it or contributed to the loss, and in a substantial manner.

Nor is it now more than speculative whether the answers materially affected the acceptance of the risk. The insurer says they did, as a matter of law; and when the court refused so to rule, it tendered evidence by one of its own officials to show that if it had known of the hospital records, containing a diagnosis of duodenal ulcer, that would have been the end of the application, and the policy would not have been issued. Again this is purely speculative. It assumes the insured, had he mentioned Beth Israel, would have done no more, that is, would not have disclosed the "drinking episode" version of the incident. It is hardly to be ruled as a matter of law that an insurance company, fully informed about such a matter, would stop its investigation at mere sight of the diagnosis and make no further attempt to investigate whether the facts disclosed to challenge not only its correctness but its verity were true. Nor was evidence to that effect offered. The argument that the answer was material to acceptance of the risk as a matter of law therefore assumes, first, only a half-disclosure of the facts by the insured, that he had been to Beth Israel and nothing more, or a half-investigation by itself, namely, of the hospital's records to the point of diagnosis, and nothing more. In short, Prudential assumes its own case on the evidence here, that the hospitalization was genuine, the records were genuine and correct, representing the results of actual and bona fide examinations, and the diagnosis was genuine and correct. The assumptions, so far as they have not been proved false, are highly speculative, and afford no ground for such a ruling as the insurer seeks, that these two answers were material, either to the risk or to acceptance of the risk, as a matter of law.

■ Nor, for the same reason, was it error to exclude the tendered evidence, which was either not applicable to the circumstances of this case or equally as speculative as the assumptions underlying the request for ruling as a matter of law. Evidence that insurance companies generally, or this one usually, declines risks on finding a hospital record disclosing diagnosis of duodenal ulcer assumes a genuine record and diagnosis, with nothing disclosed or discovered to challenge the verity of either. A practice of insurance companies to decline risks under such circumstances does not prove or tend to prove they would do so when they have notice the diagnosis is not or may not be either genuine or correct.

■ The question therefore whether the answers were material to the acceptance of the risk was, again on the evidence presented, an issue of fact for the jury to determine, and the verdict has resolved it also in favor of appellee.

The insurer has not made out, as it was required to do to avoid the policy, that any of the answers in the application was false and made with intent to deceive or was material either to the risk or to its acceptance. On the evidence in this case, these were questions of fact, the jury has found them for the appellee, and has done so on legally sufficient evidence.

V. The evidence also shows the insurer waived any grounds it may have had for avoiding the insurance after having notice of their existence. The disclosure was in the conversation, related above, between Jane Saxe and Mr. Brine, at which Mrs. Kavanagh was present. Brine said it was confined to the subject of changing the beneficiary and the mother's efforts to bring this about. The two women testified positively it also included the Beth Israel hospitalization and what the insured had told his wife about it. Their version must be accepted now as true. They also told Brine that the insured was in the hospital and thought he was going to die, and that Jane Saxe would have to borrow money to pay the premiums then and shortly to become due. On the faith of his assurance that the company's doctor would not pass a man for $10,000 unless he were in good health, the policy was not affected, and she should continue the payments, Jane Saxe borrowed from her sister what was needed and paid three premiums, for November, December and January. The conversation with Brine was on December 30. The insured died a month later. The payments were made in the interim, on January 3 and 18.

In view of these circumstances the company clearly waived any grounds it may have had to avoid the policy on account of the alleged misstatement about the Beth Israel matter. It strenuously urges there was no waiver, first, because Brine did not have authority to waive forfeitures or modify the policy in any way; second, because the disclosure was not a full one. We dispose of the latter first.

In substance Jane Saxe told Brine what her husband had told her about the incident. That need not be repeated. The insurer says this was not a full disclosure because it told only of "an insignificant hospital incident somewhere in the insured's past which amounted to no more than a 'social lapse'" and this did not put Brine or the company on notice of "the actual facts" including his "previous medical history,"

the examinations, treatment, final diagnosis of duodenal ulcer, etc. It emphasizes especially the failure to disclose the diagnosis, though the evidence does not show the insured ever knew of it. The difficulty with this now is that the jury has found the Beth Israel episode was just what the insured said it was. The insurer assumes the facts were as it contended they were, notwithstanding the verdict, and on that builds the argument of inadequate disclosure.

However, if the verdict is disregarded, the insurer was informed as to the fact, time and place of the Beth Israel hospitalization, and that the insured was seriously ill and expected to die. Jane Saxe disclosed the matter and inquired what to do, obviously because she did not wish to throw good money after bad. There was no time for delay though as it turned out there was ample time for investigation, if the insurer had acted promptly. It had authority, in the policy, to do this. It had enough to put it on notice the hospital's records or the attending physicians would disclose the true cause of the insured's stay or some other which it might wish to accept as conclusive or investigate further. The disclosure was complete, in view of the verdict. It was adequate, without reference to it. Cf. Hulbert v. National Life & Accident Ins. Co., La.App. 1933, 151 So. 87. The extremity of the insurer's position in this respect is shown by two cases on which it relies, Bennecke v. Connecticut Mutual Life Ins. Co., 1882, 105 U.S. 355, 26 L.Ed. 990, and Globe Mutual Life Ins. Co. v. Wolff, 1877, 95 U.S. 326, 24 L.Ed. 387, in both of which the insured was dead without the insurer's knowledge when the alleged waiver took place. Cable v. United States Life Ins. Co., 7 Cir., 1901, 111 F. 19, also is clearly distinguishable on the facts.

Brine was authorized to solicit risks and collect premiums. He was one of two superintendents in charge of separate Washington offices and contiguous territories or districts, including parts of Virginia and Maryland. He had a general agent's license, supervised employees and agents in the work of the office, and apparently selected them, though the home office retained the power to "hire and fire." He did not accept or reject applications or pass on risks. He submitted controversies about payments of policies and acceptance of premiums to the home office. He remitted collections to it, or saw that this was

30

done, and accounted for them. In short, he was as nearly "the insurance company" as anyone in the Washington region for dealing with policyholders and conducting its business here.

Brine had specific authority to receive the premiums. When he did so, the money was in the company's hands. He also had authority to receive, on its behalf, complaints and information concerning policies or controversies relating to them, with a duty explicitly imposed to transmit them to the home office for settlement. He received such information here. So far as the record shows, he did not forward it to New York. He might have received the premiums subject to the home office's approval after investigation or in any event. Instead both he and the company stood idle for nearly a month and until the loss fell. Then, in order to avoid it, the insurer did what it should and could have done beforehand.

These facts constituted a waiver as a matter of law.[5] Prudential says there could be no waiver because provisions in the application and the policy expressly prohibited Brine from waiving any forfeiture. The provision in the application adds nothing, in this case, to the clause in the policy. The latter is:

"Modifications, etc.—No condition, provision or privilege of this Policy can be waived or modified in any case except by an endorsement hereon signed by the President, a Vice President, the Secretary, the Actuary, an Associate Actuary, an Assistant Secretary or an Assistant Actuary of the Company. * * * No Agent has power in behalf of the Company to make or modify this or any other contract of insurance, to extend the time for paying a premium, to waive any forfeiture, or to bind the Company by making any promise, or by making or receiving any representation or information."

The provision itself is one which can be waived.[6] Furthermore, it may be questioned whether an insurer can give an agent authority as extensive as Brine had, placing him in charge of its local business, with no local superior, and empowering him to act for it in so many matters beneficial to itself, yet by such a provision disclaim and escape all responsibility for his action when adverse to itself. Such a "one-way street" in agency was condemned, in words appropriate to the facts here; in Saucier v. Life & Casualty Ins. Co., 1938, 181 Miss. 887, 179 So. 851, 852:

"The waiver of the limitation need not in fact be by the company, but may be by an agent who has authority to act for the company in his locality for all purposes connected with the contract, who is the alter ego of the company in his locality, and that the rule is based on the principle that the company cannot make its local agent the medium through which all the benefits of the policy flow from the insured to it, and then deny his authority to represent it when the benefits of the insured are involved." [7]

The provision, if applied to the full extent of its terms, would deprive all agents of power to make a waiver, except that one of the principal officers mentioned could do so, if he made it in writing endorsed on the policy. Conceivably this limitation might be valid in some applications, where formal waiver or modification of an important term or provision in the policy itself would be involved and the circumstances were different from those here presented.

But it need not be decided whether the clause is valid as to contractual waivers or promissory representations, as such, made by an officer or agent otherwise than by endorsement on the policy. For, in this case, the waiver need not be based on Brine's representations, in effect, that the company relied upon its medical examinations, the policy would not be affected, and Jane Saxe should continue to pay the premiums. It can be assumed, though we do not decide, that these were not effective as technical waivers in the contractual or promissory sense, or in that of "binding the Company * * * by making any representation"; in other words, Brine's assurance and promise may be disregarded without affecting the waiver.

[5] See Phoenix Mutual Life Ins. Co. v. Raddin, 1887, 120 U.S. 183, 194–196, 7 S.Ct. 500, 30 L.Ed. 644; Bowles v. Mutual Benefit Health & Accident Association, 4 Cir., 1938, 99 F.2d 44, 119 A.L.R. 756.

[6] Federal Life Ins. Co. v. Rumpel, 6 Cir., 1939, 102 F.2d 120; Vance, Insurance (1930) 478.

[7] Cf. Vance, Insurance (1930) 437.

But to make it effective the company must be regarded as having notice of the Beth Israel matter, and for that purpose Brine's knowledge must be considered as notice to it. It should be so held, regardless of the provision that he had no power "to bind the Company by * * * accepting any * * * information." National Life Ins. Co. v. Grady, 1923, 185 N.C. 348, 117 S.E. 289; cf. New York Life Ins. Co. v. Eggleston, 1878, 96 U.S. 572, 577, 24 L.Ed. 841. If this were legally effective, there would be no way in which the company could acquire knowledge or be given notice of facts adverse to its interest. The only way such facts could be made legally effective against it would be by endorsement of waiver on the policy by one of the officers authorized to do this. Until that should be done, it could not be regarded in law as even knowing of the matter. Such a result would be absurd on its face. While a corporation may, within limits, bound the authority of officers and agents to make contracts, waivers or representations, whether promissory or of fact, it cannot disable itself entirely to receive information or notice of facts affecting its interests, as the clause depriving all agents of such power attempts to do. Otherwise it would become an incorporeal being, not only "invisible, intangible, existing only in the *contemplation* of the law," but one legally deaf and blind as well. There is no such legal creature.

In this case Brine was not without authority to receive information on the company's behalf. He was authorized to forward complaints and controversies concerning matters affecting policies to the home office. It was his duty to do this. When he failed, it was a breach of his duty to the company, and at the same time of its duty to the insured and to the beneficiary. Under the circumstances in which the knowledge was communicated, the insurer owed them the obligation to act, to do so promptly, and in such a manner as not to lull them into false security, so that the loss would fall and foreclose any opportunity to secure further action to establish, preserve or settle their rights. If more was needed than was done, the insurer should have informed the insured or his representative what it was. It cannot now shift to appellee's shoulders the burden of Brine's breach of duty to itself, or of its own duty to the insured. Consequently when Brine received the knowledge and failed to communicate it promptly to his principal, that is, the home office, it became charged with notice of the existence of the grounds for forfeiture. When, in addition, it received the premiums and allowed the matter to rest for nearly a month, and until the loss had fallen, without returning them or doing anything further about the matter, the waiver was effectually completed. We have purposely put the matter thus narrowly, because on these facts it is not necessary to decide whether Brine's receipt of the information and the premiums, without more, would have been sufficient as a waiver. Had the policy merely provided for a reasonable period in which he could communicate with the home office and it could investigate and decide the matter, and if these things had been done, another question would be presented, though in that case the litigation probably would have been avoided.

The insurer says it was error to admit the evidence concerning the conversation between the insured and his wife on December 29 and between her and Brine the next day, on the grounds that the former consisted principally of self-serving declarations by the insured and the entire conversation was hearsay, made out of the presence of a representative of the insurer. We think the court rightly admitted the evidence as showing what led up to the visit by Jane Saxe and Mrs. Kavanagh to Brine's office and the reason for their going. It was necessary also to show that they had made a full disclosure of the facts to Brine. Prudential also complains that the court would not permit it to cross-examine Jane Saxe and Mrs. Kavanagh concerning what was said in the former's conversation with Brine, but the record shows this limitation was only with reference to what was said concerning the change in beneficiary. The court's ruling was obviously right that this phase of the conversation did not affect the insurer's case. There was no error in either of these respects.

VI. It remains to consider the alleged procedural errors. There was no error in consolidating the causes for trial or refusing to try the so-called equitable issues separately and before proceeding with the trial at law. The insurer's suit to cancel the policy was filed the day before Jane Saxe instituted her suit to recover on the policy, in which Gertrude Saxe intervened. The grounds asserted for cancellation were the same as those relied upon

for defense in the suit to recover on the policy. The parties were the same. It was clearly proper therefore for the court to consolidate the causes and submit the entire matter to jury trial. In Phœnix Mutual Life Ins. Co. v. Bailey, 1871, 13 Wall. 616, 80 U.S. 616, 20 L.Ed. 501, the insurer sued to cancel policies for fraud. An action at law later was begun to recover on them. The decision sustained the dismissal of the bill, because the insurer had a complete remedy by way of defending in the action at law and the claimant on the policy had a right to trial by jury. See, also, to the same effect, Adamos v. New York Life Ins. Co., 1935, 293 U.S. 386, 55 S.Ct. 315, 79 L.Ed. 444; Enelow v. New York Life Ins. Co., 1935, 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440; Cable v. United States Life Ins. Co., 1903, 191 U.S. 288, 24 S.Ct. 74, 48 L.Ed. 188.

An exception exists, however, when there is an incontestability clause and the insurer sues within the period, American Life Ins. Co. v. Stewart, 1937, 300 U.S. 203, 57 S.Ct. 377, 81 L.Ed. 605, 111 A.L.R. 1268, on the basis that, unless the insurer can sue, the beneficiary may sit by until the period passes, then bring his action, and in effect so defeat the insurer's defenses, thus making its remedy by defense to the suit at law entirely speculative and inadequate. Cf. Densby v. Acacia Mutual Life Ass'n, 1935, 64 App.D.C. 319, 78 F.2d 203, 206, 101 A.L.R. 863; New York Life Ins. Co. v. Seymour, 6 Cir., 1930, 45 F.2d 47, 73 A.L.R. 1523. It does not follow, however, from the reason for the exception or the rule itself, either that the causes must be tried separately or the so-called equitable issues must be tried first, when the suit in equity and the action at law are filed substantially simultaneously, as in this case one day apart, and the issues themselves are properly triable by a jury. So to rule would be, in effect, to deprive the claimant of the right to jury trial, make the filing of the suits a race of diligence, and do these things when the danger which would render the insurer's remedy inadequate, in the circumstances in which the exception applies, does not exist. Since the suits were consolidated, there was no danger that the claimants could dismiss their action to the insurer's prejudice. The running of the incontestable period was stopped. The insurer was deprived of no substantive defense or claim, nor of any advantage the exception was created to confer or protect. Its purpose was not simply to give the insurer a right to have tried by the court issues properly triable by jury. This was the real advantage the insurer sought in this case and the only one, apart from opening and closing, of which it was deprived. In view of the effect of the contrary ruling upon the claimants' right to jury trial, it was clearly not beyond the court's discretion to consolidate the causes and decline to try the substantive issues concerning the insurer's liability in advance of submitting them to the jury. In these circumstances the insurer is attempting to make the issue of fraud, properly triable as a matter of defense to claim of liability on the policy, an "equitable" one for trial by the court. It is not the nature of the issues, but the inadequacy of the remedy, which creates the exception of the Stewart case. There is no such inadequacy here.

Since the decisions cited above came down the Federal Rules of Civil Procedure [8] have become effective, and the insurer urges a contrary result on the basis of Rule 13 (a), as follows: "A pleading shall state as a counterclaim any claim, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

The argument is that, since the insurer's suit for cancellation was filed first and appellee's claims arose "out of the transaction or occurrence" which was the subject matter of its suit, they are compulsory counterclaims under the rule.

Union Central Life Ins. Co. v. Burger, D.C.S.D.N.Y.1939, 27 F.Supp. 554, appears to support this view. There the suit for cancellation was filed, the defendants filed a counterclaim for the amount of the benefits, and then moved for dismissal for insufficiency of the complaint and for an order for a jury trial. The court denied both motions. It pointed out that under former Equity Rule 30 [Equity Rules, 28 U.S.C.A. § 723 Appendix (1941)] a defendant in an equity suit was not required to set up a legal counterclaim, but if he did so and went on to trial, he was held to have waived

---

[8] 28 U.S.C.A. following section 723c.

a jury trial. American Mills Co. v. American Surety Co., 1922, 260 U.S. 360, 43 S.Ct. 149, 67 L.Ed. 306. The court then went on to say that Rule 13(a) now makes it compulsory to plead a legal as well as an equitable counterclaim, if it arises from the same transaction or occurrence as that on which the opposing party's claim is based. The court held the defendants were required to set up their legal counterclaim in the answer and commented:

"In thus doing what they were compelled to do, I do not think that they should be held to have waived a jury trial. It has, however, always been recognized that in cases of this kind, the equity issues should be disposed of first; Jefferson Standard Life Ins. Co. v. Keeton, 4 Cir., 292 F. 53; American Mills Co. v. American Surety Co., supra * * *. This probably will determine all of the issues in the case. If it does not, the defendants may proceed with their law action on the counterclaim." 27 F.Supp. at page 555.

There is one obvious difference between the facts in the Union Central case and this one, namely, that the beneficiary there had not filed an action at law. Here that was done, within a little over eight months from the insured's death and well within the period allowed by the incontestibility clause for contesting the claims on the policy. Much of the eight months must have been taken up with making proofs of loss, investigation by the insurer into the Beth Israel matter, negotiations for settlement, etc. In other words, there is no evidence that appellee delayed instituting her suit, filed October 5, 1938, for any purpose of defeating the insurer's defenses. Rather the inference is legitimate on the facts, that the insurer had knowledge she was preparing her claim for suit, and rushed its own to prior filing in order to secure a trial of the issues determining its liability by the court and forestall her in securing a jury trial. No such facts were presented in the Union Central case. The action there taken, on the facts presented, appears to have been proper in all respects, except possibly in the court's refusal to grant the motion for a jury trial. Cf. Ettelson v. Metropolitan Life Ins. Co., 1942, 63 S.Ct. 163, 87 L.Ed. ——. It may have been, too, that this was justified upon the facts and issues presented by the bill and the counterclaim. But if the issues presented in the bill and the counterclaim were identical or practically so, as they appear to have been

and are here, and were such as could be fully determined at law, it would seem the denial of the motion had exactly the effect the court said it did not think should be given to the filing of the counterclaim, namely, to make of it a forced waiver of jury trial. Under former Equity Rule 30, the waiver followed, because the rule did not compel the defendants to set up a legal counterclaim. Under Rule 13(a), as the court interpreted and applied it, they are forced to do this. What formerly was a matter of choice and therefore effective as a waiver becomes, in such a change, waiver by compulsion. The defendant's only alternatives are judgment by default and "waiver" of jury trial.

This, in effect, is not waiver, but surrender of the right, forced by the rule. If its operation is perforce to make the right depend solely on whether the insurer or the claimant succeeds in getting the bill or the complaint into the court's files first, in a mere race of diligence, there would be serious question, first, whether in such an application it would not be wholly arbitrary, and, second, whether it would not be invalid, as going beyond the scope of the rules as affecting only procedure and, in effect, depriving the claimant of the right to jury trial. Act of June 19, 1934, 48 Stat. 1064, 28 U.S.C. § 723b (1940). It was not the purpose of the rule to bring about such a forfeiture. It was rather to eliminate the confusion existing under Equity Rule 30 from the facts that it did not require the filing of legal counterclaims and the federal practice regarding them was governed by state practice which varied widely. It would seem clearly to be giving Rule 13(a) more force than it was intended to have if, in addition to requiring the counterclaim to be filed, that coupled with getting into court first should have the necessary effect, not present under the old rule or intended under the new one, of waiving the right to jury trial.

Furthermore, it is at least doubtful whether, in these circumstances, the rule required the filing of the counterclaim. The language is: "A pleading shall state as a counterclaim any claim, *not the subject of a pending action,* which at the *time of filing the pleading* the pleader has against any opposing party * * *." The language taken literally does not apply to the present facts, because "at the time of filing the pleading," namely, the counterclaim, the claim it stated *was* "the subject of a

pending action," namely, appellee's suit. But in the circumstances waiver cannot be implied, since in the absence of answer there was danger of default and appellee's only answer, on the merits, was what the counterclaim set forth. Again the alternative was not default or waiver of the jury.

Finally, Rule 42 confers on the District Court broad discretionary powers for consolidation of actions "involving a common question of law or fact." Rule 13(a) should be construed in harmony with it. We need not decide, therefore, whether appellee had a right to jury trial, in these circumstances, or whether it would have been an abuse of discretion to deny it. The court's discretion was exercised in her favor, and there clearly was no abuse in so exercising it. This applies both to the consolidation of the causes and to the denial of the motions, after consolidation, for the separate and prior trial of the so-called equitable issues.

Nor was there reversible error, as Prudential asserts, in trying the issues between Jane Saxe and Gertrude Saxe in the same cause and at the same time as the issues between them, or each of them, and the insurer. It is said this phase of the trial consumed the greater and later portion of it, developing the acrimonious differences between the women before the jury, to the insurer's prejudice. This argument, however, is one more properly addressed to the trial court's discretion. The matter was one for its discretion primarily, and there were obvious advantages to be gained from determining the entire controversy at once, as well as possibilities for disadvantage to the court and to the parties. It may be noted that the differences between the claimants were almost entirely confined to issues between themselves, and did not involve different bases for recovery against the insurer, except in respect to the question whether the attempted changes of beneficiary were effective.

VII. That question may be disposed of quickly. There was much argument whether the attempted changes were effective, since they were not endorsed on the policy as it required, but were made on separate documents, the first one not on the usual form furnished by the company. These questions need not be considered, since it was contended that both assignments were procured through undue influence exercised upon the insured by his mother, and the evidence is clearly sufficient to sustain a finding to that effect. In the absence of a special interrogatory, we must assume the verdict found for the appellee on this issue.

The evidence need not be repeated in detail. The first assignment was secured by the mother on January 6 while the insured was in Garfield Hospital, the second one after she removed him to the apartment, from which she excluded appellee, only two days before his death. At both times he was mortally sick and growing rapidly worse. He expected to die. According to his statement as reported by Jane Saxe and Mrs. Kavanagh, before the first assignment was made his mother had been "hounding me all day to change my insurance over to her." She had begun doing so before he entered the hospital. She kept it up afterward, until he succumbed and signed over to her half the insurance his wife had paid for. Not satisfied with that, she kept on until she got all of it. He told his wife to keep the policy until he should call for it. It was taken out originally both for her protection and as security for her earnings expended for living purposes when the insured was unemployed. She paid the premiums. The evidence of the mother's deep-seated hatred for the wife, and of the latter's fear of her, apparent even at the trial, need not be spread on this record. Nor is citation of authority needed to show that the verdict, on such evidence, must be sustained. The instructions were brief, but sufficient. There were no exceptions to the charge.

There were numerous assignments of error in relation to the admission and exclusion of evidence. Many are not meritorious. In other instances, if there was error, it was not prejudicial.

The judgment is affirmed.

STEPHENS, Associate Justice (dissenting).

Case No. 7824 should, in my opinion, be reversed for failure of the trial court to direct a verdict for the appellant: In view of the insured's Beth Israel Hospital experience and his medical history as disclosed in the Hospital records, I think the insured's negative answers to questions 6D, 7A, 9A and 10A and his affirmative answer to question 10B of the insurance application constituted misstatements which all reasonable jurymen must have found materially

affected the acceptance of the risk; and I think that the alleged waiver of the appellant's right to avoid the policy because of misstatements in the application was as a matter of law ineffective for the reason that undisputedly the material facts concerning the insured's Beth Israel Hospital experience and medical history as shown in the Hospital records were not fully disclosed to the appellant at the time of the alleged waiver. Waiver is an intentional relinquishment of a right and therefore requires knowledge of the existence of the right or of the facts upon which the same depends.

In case No. 7825 I think the instructions of the court to the jury on the subject of burden of proof in respect of undue influence were insufficient.