## BECKER v. UNITED STATES.
### No. 8482.

Circuit Court of Appeals, Seventh Circuit.

Nov. 3, 1944.

172

. Alexander M. Campbell, U.S. Atty., of Fort Wayne, Ind., James E. Keating, Asst. U.S. Atty., of South Bend, Ind., Francis M. Shea, Asst. Atty. Gen., Lester P. Schoene, Director of War Risk Litigation, and Fendall Marbury, Atty., Dept. of Justice, both of Washington, D. C., Wm. M. Lytle, of Chicago, Ill., and Wilbur C. Pickett, Asst. Dir., Bureau of War Risk Litigation, of Washington, D.C., for appellant.

Harold R. Schradzke, of Chicago, Ill., and Arthur Poorman, of Chicago Heights, Ill., for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

In 1932 Kingsley J. Becker filed suit against the United States to recover on a war risk insurance policy, alleging that while the policy was in effect he became permanently and totally disabled from following continuously any substantially gainful occupation. He obtained a judgment from which an appeal was taken to this Court. We reversed and remanded for a new trial on the ground that the judgment was not supported by substantial evidence. United States v. Becker, 86 F.2d 818.

When the case had returned to the District Court, the complaint was amended by adding to the alleged disabling causes "mental diseases and disorders." Since the plaintiff has been judicially declared insane before the second trial, a guardian was appointed for him, and the guardian was substituted as plaintiff. The case was again tried before a jury, and by stipulation all of the evidence on the former trial was read into the record on this trial. At the conclusion of all of the evidence, the Government made a motion for a directed verdict, which was denied. The case was submitted to the jury, which returned another verdict for the plaintiff, upon which the District Court entered judgment. The Government filed a motion for judgment notwithstanding the verdict, which was overruled. From judgment on the verdict, this appeal is taken.

Error is assigned on the · admission of certain evidence, especially the insured's testimony about some harrowing experiences on the battlefield, but we find no substance in the Government's objections to this evidence. The testimony was clearly relevant and material on the question of the insured's mental and physical condition.

The only question presented then is whether there is substantial evidence to support the jury's verdict. In reviewing a case to determine whether there is substantial evidence to support the verdict, we do not weigh the evidence. All conflicts are resolved in favor of the verdict. We consider only the evidence tending to support that verdict. Berry v. United States, 312 U.S. 450, 452, 61 S.Ct. 637, 85 L.Ed. 945; Adams v. United States, 7 Cir., 116 F.2d 199, 200; Knapp v. United States, 7 Cir., 110 F.2d 420, 422.

At the second trial, two veterans who had served with the insured overseas testified as to the insured's mental and physical condition during that period. Another new witness was the foreman under whom the insured worked while he was employed by the telephone company. He testified as to the low calibre of the insured's work and his poor mental and physical condition. Dr. Harmon, who had also testified on the first trial, was recalled to answer a hypothetical question. He testified that in January, 1919, when the insured had signed an order cancelling his insurance, causing it to expire on March 3, 1919, the insured was mentally incapable of performing this act understandingly. The insured himself had no recollection of having ordered the cancellation.

At the present time the insured is admittedly insane. He is suffering also from

an arthritic condition which renders him permanently and totally disabled. He has not worked since 1928. His mental condition, according to Dr. Harmon, is as disabling as the arthritis and was diagnosed by Dr. Harmon as psychoneurosis. Dr. Staten, an x-ray expert, made x-rays of the insured's spine and sacro-iliac joints and testified that the type of arthritis from which the insured is suffering starts in the sacro-iliac joints and extends up the spine. Dr. Fisher testified that such arthritis begins as an acute inflammatory process which is aggravated by physical activity and causes loss of sleep. Dr. Harmon testified that the arthritis was chronic and progressive, that in the beginning it was painful and that any motion would make it more and more painful. Both Dr. Fisher and Dr. Harmon testified that the insured's arthritis dated back to January, 1919. Dr. Fisher was of the opinion that it was then acute. Dr. Harmon testified that shell shock, fatigue, or horrifying experiences would cause a mental condition like the insured's, that such a mental condition made the afflicted person nervous, irritable and easily upset, and that such persons have difficulty adjusting themselves socially and economically. From this evidence a jury would be warranted in finding that the insured, in January, 1919, had acute arthritis and a psychoneurosis diagnosed as hysteria. But did this arthritic and mental condition exist in such virulence on that date as to render the insured permanently and totally disabled from following continuously any substantially gainful occupation? That is the question which the jury had to decide.

The insured was only seventeen years old when he enlisted in 1917. He was a lively, exuberant youth, nicknamed by his comrades "Kid Becker," because he was the youngest one in the outfit. In the winter of 1918 in France, this young boy in bitterly cold weather was required to pull heavy artillery pieces through the snow. Bearing in mind that the type of arthritis from which the insured was suffering has its origin in the sacro-iliac region, it is a fair inference that the great effort of moving these heavy guns strained this area. In April, 1918, a shell filled with mustard gas hit the dugout where the insured was on telephone detail, gassing and burning him with mustard gas, so that he had to be hospitalized. After this gassing he suffered a permanent shortness of breath and his voice became weak and breathy. The

trenches and dugouts in which he lived were deep, damp, and cold, and the floors were covered with water. The food was often cold and, during this period, the insured had a severe case of dysentery.

In July, 1918, another shell exploded near the insured, knocking him twenty feet, and rendering him unconscious. In his unconscious condition he was taken to the first-aid station where he was revived. After this second shell shock, the insured would often lose track of what he was told to do, and would wander off, forgetting where he was and what he should be doing. The men in his outfit looked after him and gave him special care. He was dependent upon his comrades. He could not march and was allowed to ride in one of the wagons. He was taken off the regular telephone detail and placed in the kitchen. From June to December, 1918, he was suffering from pain. He could not be relied upon to do what he was told. Someone always had to see that he did his work. While on kitchen duty, he would disappear without a word. When given a command he would just stare and give unintelligent answers, or not answer at all. He was inefficient and of no help in the kitchen. He could not understand what he was told to do. As one of his comrades who testified on the second trial described him, "He had a starey look * * * he seemed to lack intelligence. He was incoherent. You could not converse with him * * *. If he was placed under your command or anything you just simply had to watch him, because he was apt to do most anything * * * he had acquired a rather ugly disposition * * *. It was an aggravation to have him about the kitchen or anywhere else where there was any responsibility." Both of his comrades testified at the second trial that the insured complained of pains in his legs, back, and shoulders and so suffered from stiffness that he could hardly get around.

On June 30, 1919, the insured was discharged from an evacuation hospital with a diagnosis of acute rheumatism, which, the doctors testified, is the same as arthritis. In July, 1919, the insured was hospitalized for his mental condition. He was shipped back to the States in a cage with other mental patients and a tag was placed upon him which read, "Mental Case." In August, 1919, in a hospital in New York, six days before his discharge, his condition was diagnosed as "Psychoneurosis, Hysteria."

174

A number of witnesses, some of whom had known him before the war, testified that when he returned from the Army he was thin and pale, stooped over, and short of breath. His voice was weak. He looked as if he had shrunk. His face appeared haggard and drawn, and his neck was stiff. He had difficulty in walking. He moved about slowly, dragging his feet along. He appeared to be suffering and often complained about pain in his back, legs, and feet. Since his discharge, the insured has been under the treatment of doctors almost continuously.

On the first trial, and on this one, much is made of the work record of the insured. The insured went back to his old job working for the Wilson Shirt Company on September 14, 1919, eight days after his discharge, but he was suffering pains and was "unable to get around." He could not keep up his work there, and had to quit. The evidence is that between 1919 and 1923, the insured had nine different jobs ranging from those lasting a few weeks to one with the telephone company lasting a year, four months, and eleven days. The foreman at the telephone company, one of the new witnesses at the second trial, testified that the insured was nervous and shaky, and was easily exhausted; that because of his condition he was given easier work; that it was hard to make him understand directions; and that the other men helped him out when he could not hold up his end of the work. Several times the insured had to leave work because he was ill, and even when he left for two, three or four hours during the day, he was given a full day's pay. The insured testified that during this period of three months, when the work was largely out of doors, he was unable to report for work fifteen or twenty times.

It was the same story of failure every place that he tried to work. The undisputed evidence of the insured shows that, during the time he was employed in these nine different jobs, he was unable to work for one-third of the time because of his disability, and that even while he was working he was in physical pain and was unable to do his full share of work. As Mr. Justice Black stated in Berry v. United States, supra, 312 U.S. at page 456, 61 S.Ct. at page 639, 85 L.Ed. 945:

"And the jury could have found that his efforts to work—all of which sooner or later resulted in failure—were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies."

Bearing in mind that the insured in 1919 was suffering from two disabling diseases arising out of the horrors of poison gas, shell shock, exposure and dysentery; that arthritis had added to his mental distress, and the latter had aggravated his physical ill-being; remembering that his arthritis was made worse by the insured's futile efforts to work, and that both diseases got progressively worse until this soldier became an insane invalid, we believe that a case is presented where the jury was amply warranted in returning the verdict it did. With that picture before it, it could hardly have reached any other verdict. Two juries have heard the story and both have found for the insured. The distinguished trial judge who heard the case twice sustained the jury's verdict. The evidence on the second trial was materially strengthened by additional witnesses.

Whether under such circumstances permanent and total disability existed on March 3, 1919, was a matter for the jury to pass upon. Berry v. United States, supra; Halliday v. United States, 315 U.S. 94, 97, 98, 62 S.Ct. 438, 86 L.Ed. 711; Tyrakoski v. United States, 7 Cir., 119 F.2d 339, 341. Since the jury has resolved the question in favor of the insured and we feel that its verdict is supported by substantial evidence, the judgment is affirmed.