**NEW YORK LIFE INS. CO. v. TAYLOR.**

No. 8488.

United States Court of Appeals
District of Columbia.

Argued March 14, 1944.

Decided May 8, 1944.

Argued on Rehearing Oct. 3, 1944.

Decided Jan. 10, 1945.

EDGERTON, Associate Justice, dissenting in part.

———◆———

Mr. R. Aubrey Bogley, of Washington, D. C., with whom Messrs. Frederic D. Mc-Kenney, John Spalding Flannery, G. Bowdoin Craighill, and John R. Wall, all of Washington, D. C., were on the brief, for appellant.

Mr. Lowry N. Coe, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

This is an action brought on a life insurance policy to recover double indemnity under a provision making such double indemnity payable if the death of the insured resulted from "bodily injury effected solely through external, violent and accidental causes." [1]

The insured was killed while a patient at Walter Reed General Hospital in Wash-

---

[1] The double indemnity amounted to only $2,000 but this suit was brought prior to the act conferring exclusive jurisdiction on the Municipal Court where the amount involved is less than $3,000.

ington, D. C., by a fall down a stair well which was protected by a railing. The fall occurred at night and there were no witnesses. The circumstances indicated possible suicide. The jury gave a verdict for double indemnity under the policy. Defendant appeals from a judgment on that verdict.

The first error claimed is that the trial court excluded the statement of a physician which was part of the proofs of death required to be furnished by the beneficiary. The statement contained the opinion that the insured committed suicide.

The trial court excluded the statement of opinion as to suicide after concluding from the record that the beneficiary had not authorized the submission of such a statement to the insurance company. It appeared that the insurance company had sent the physician (who was also the coroner) the form, which he had filled in. This was at the request of the beneficiary. But the court concluded that the beneficiary had not seen the physician's statement before it was transmitted to the company. It appeared that representatives of the company had assisted the beneficiary in completing the proofs of death, and had not called her attention to the fact that the physician's opinion as to suicide was inconsistent with her own statement that the death was accidental. It also appeared that the physician who made the statement had no personal knowledge of the cause of death. While the record as to all these circumstances is not clear, counsel for appellant failed to deny any of the court's conclusions of fact during the argument on the admissibility of the evidence.

■ On the basis of its conclusions of fact the court's ruling was correct. Ordinarily a statement by a physician submitted by the beneficiary of a policy as part of the proofs of death is admissible to show the manner of death.[2] Its admissibility is based on the fact that the beneficiary whose duty it is to furnish the proofs of death must be presumed to have authorized the statements made in those proofs. If later at the trial she takes a position inconsistent with the proofs of death which she has submitted those statements are admissible as her representations. As the Supreme Court said in the case of

Mutual Life Ins. Co. of Newark, N. J. v. Newton,[3]:

"* * * the proofs presented were admissible as representations on the part of the party for whose benefit the policies were taken, as to the death and the manner of the death of the insured. They were presented to the company in compliance with the condition of the policy requiring notice and proof of the death of the insured as preliminary to the payment of the insurance money. They were intended for the action of the company, and upon their truth the company had a right to rely. Unless corrected for mistake, the insured was bound by them. Good faith and fair dealing required that she should be held to representations deliberately made until it was shown that they were made under a misapprehension of the facts, or in ignorance of material matters subsequently ascertained."

■ It is apparent from the above opinion that proofs of death are competent evidence of the cause of death only where the relevant statements contained therein are authorized by the beneficiary.[4] The fact that the beneficiary submitted the proofs to the insurance company creates a presumption that the statements were authorized. But here the evidence on the voir dire rebuts that presumption. The statements of the physician, who had no personal knowledge of the accident, were inconsistent with the statement of the beneficiary, so that there is a normal inference that they were not called to her attention. Insurance companies engaging in the laudable practice of assisting beneficiaries in making out proofs of death should call attention to inconsistencies in the proofs if they expect later to use them against the person they are assisting on the theory that she was consciously adopting or authorizing a statement that contradicted her own report.

■ Appellant contends that the court erred in permitting plaintiff to introduce the claimant's statement and the friend's statement, which were part of the proofs of death, without offering the physician's statement. This was error because the proofs of death, if admitted at all, should have gone in as a whole. But the error

2 Wertheimer v. Travelers' Protective Ass'n. 70 Cir., 1933, 64 F.2d 435.

3 18715, 22 Wall. 32, 35, 22 L.Ed. 793.

4 "Where the beneficiary in an insurance policy files as a part of the proofs of death such a certificate as this, under the circumstances of this case it amounts to an approval by him of the statements in it as correct and should be received in evidence against him as

was not prejudicial because the admitted proofs of death contained nothing which added to the testimony beyond the fact that the plaintiff had not changed her position. It is hardly possible that this affected the verdict.

The second ground of error is the refusal of the trial court to admit in evidence the original records of Walter Reed General Hospital relating to the cause of the death of the insured. These records consisted of the following documents: (1) A history of the insured's admission to the hospital giving an account of his illness and his state of mind; (2) A diagnosis of insured's condition when he was admitted; (3) Reports on three operations performed in the hospital; (4) Reports of conversations with the insured indicating that he had attempted suicide; (5) Report of consultation with a psychiatrist containing statements by the insured that he wished to die; (6) Report of a psychiatrist showing a diagnosis of "psychoneurosis, hysteria, conversion type"; (7) Transcript of the proceedings and findings of the Board of Officers of Walter Reed General Hospital to determine the cause of the death of the insured.

The policy contained a waiver [5] of any privilege [6] against the disclosure of information acquired through confidential treatment by physicians. We believe that it was a sufficient waiver of the privilege provided in Section 14—308 of the District of Columbia Code. Therefore, these records, or at least a large portion of them, would have been admissible in connection with the testimony of the witnesses to the events or opinions contained in the reports. However, had such witnesses been called they would have been subject to cross-examination. The question here is whether these records are admissible in the absence of direct testimony, under the so-called Federal Shop Book Rule,[7] which reads as follows:

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. * * *"

A literal reading of the above statute would make the records in this case admissible on the theory that the business of operating a hospital requires records of the histories of patients, reports of unusual conduct and also diagnoses by physicians. But the Supreme Court in Palmer v. Hoffman,[8] has, we believe, limited the admission of records under the Federal Shop Book Rule statute to those which are trustworthy because they represent routine reflections of day-to-day operations. The opinion in that case holds that the statute is not one "which opens wide the door to avoidance of cross-examination."

In this case the records are not offered to prove routine facts such as the date of admission to the hospital, the names of the attending physicians, etc. They are offered to prove the truth of accounts of events and of complicated medical and psychiatric diagnoses. The accuracy of such accounts is affected by bias, judgment, and memory; they are not the routine product of an efficient clerical system. There is here lacking any internal check on the reliability of the records in this respect, such as that provided for "payrolls, accounts receivable, accounts payable, bills of lading and the like." The Supreme Court has stated that the test of admissibility must be "the character of the records and their earmarks of reliability * * * acquired from their source and origin and

an admission by adoption. 2 Wigmore, Evidence, 2d Ed., § 1073, p. 570." Russo v. Metropolitan Life Ins. Co., 1939, 125 Conn. 132, 3 A.2d 844, 846.

5 "Waiver Provision of the Policy. I expressly waive, on behalf * * * of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician * * * who may hereafter attend or examine me, from disclosing any knowledge or information which he thereby acquired."

6 For cases applying the privilege statute to hospital records see Kaplan v. Manhattan Life Ins. Co., 1939, 71 App. D.C. 250, 109 F.2d 463; Eureka-Maryland Assur. Co. v. Gray, 1941, 74 App. D.C. 191, 121 F.2d 104; Carmody v. Capital Traction Company, 1915, 43 App.D.C. 245, Ann.Cas.1916D, 706.

7 Act of June 20, 1936, c. 640, § 1, 49 Stat. 1561, 28 U.S.C.A. § 695.

8 1943, 318 U.S. 109, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

the nature of their compilation." [9] To admit a narrative report of an event, or a conversation, or a diagnosis, as a substitute for oral testimony, is to give any large organization the right to use self-serving statements without the important test of cross-examination. Cross-examination is unimportant in a case of systematic routine entries made by a large organization where skill of observation or judgment is not a factor. We believe that Palmer v. Hoffman restricts the application of the Federal Shop Book Rule statute to that type of business entries.

In Palmer v. Hoffman the record sought to be introduced was a report of a railway accident which was required by the rules of the railroad. Its exclusion was affirmed. While the case may be technically distinguished we think it stands for the general principle we have outlined above and that the rule of the court in excluding these hospital records is correct.

 The final assignment of error is based on the instructions of the court as to the burden of proof. According to the terms of the policy the plaintiff had the burden of establishing that death was accidental in order to recover double indemnity. The evidence was such that the jury might have drawn the inference of suicide from all the circumstances. But the court adopted the theory that the presumption against suicide, based on the instinct of self-preservation, changed the burden of proof. It, therefore, instructed the jury that the burden was on the defendant to show by a preponderance of the evidence that the death of the insured was *not* the result of accident. An instruction placing the burden of proving accidental death on the plaintiff was refused.

This was error. The principle that a presumption such as the one against suicide shifts only the burden of going forward with the evidence, and does not change the ultimate burden of proof, is so well settled that it scarcely needs a citation of authority. The Supreme Court has specifically applied that principle to a suit to recover double indemnity on a life insurance policy where the issue was whether the insured committed suicide.[10] It cannot be contended in this case that the erroneous instruction was not prejudicial, because the evidence was such that the result might well have depended on where the ultimate burden of proof lay.

Reversed and remanded.

EDGERTON, Associate Justice.

I think hospital records are admissible under the federal shop-book rule.[1] The Second Circuit expressly reasserted that proposition in its opinion in Hoffman v. Palmer,[2] and I think the Supreme Court, in its opinion affirming Hoffman v. Palmer, asserted it by clear implication. The basis of the Supreme Court's decision in Palmer v. Hoffman, as I understand it, is that a railroad engineer's accident reports "are not for the systematic conduct of the enterprise as a railroad business. * * * Their primary utility is in litigating, not in railroading."[3] " 'Regular course' of business," the Court said, "must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business."[4] The business of hospitals is caring for patients. The methods systematically employed for the conduct of that business include the making of such records as appellant offered in this case. Proper care of patients would be impossible without such records. Their primary utility is not in litigating. In my opinion, therefore, the decision in the Palmer case does not exclude them and the argument in that case, as well as the statute, admits them.

In other respects I concur in the opinion of the court.

On Rehearing.

ARNOLD, Associate Justice.

The insured was found dead at the foot of a stairwell in Walter Reed Hospital.

[9] Id., 318 U.S. page 114, 63 S.Ct. page 480, 87 L.Ed. 645, 14 A.L.R. 719.

[10] New York Life Ins. Co. v. Gamer, 1938, 303 U.S. 161, 58 S.Ct. 500, 82 L. Ed. 726, 114 A.L.R. 1218; see also Jefferson Standard Life Ins. Co. v. Clemmer, 4 Cir., 1935, 79 F.2d 724, 103 A. L.R. 171; Scales v. Prudential Life Ins. Co., 5 Cir., 1940, 109 F.2d 119.

[1] Ulm v. Moore-McCormack Lines, Inc., 2 Cir., 115 F.2d 492; Id., 2 Cir., 117 F.2d 222; Reed v. Order of United Commercial Travelers of America, 2 Cir., 123 F.2d 252.

[2] 129 F.2d 976, 992.

[3] 318 U.S. 109, 114, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

[4] 318 U.S. 109, 115, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

The question is whether he died as a result of suicide or of an accident. As evidence of suicide the defense offered a number of authenticated hospital records to prove that the insured's state of mind was one which indicated the probability of suicide. These hospital records were kept in the regular course of business according to the colloquial use of these words. The issue here is whether they were "in the regular course of business" within the technical meaning of that phrase as used in the Federal Shop Book Statute.[1]

The trial court rejected all these hospital records and though we reversed on another ground we upheld that ruling. Thereafter, this rehearing was granted confined to the question of whether the hospital records offered, or any part of them, were properly rejected. The records which seem to be most relevant to show a state of mind of the insured which might indicate suicide consist of two reports of a neuropsychiatric consultant and one report of an attending physician, based on information obtained from a nurse, that the insured took an overdose of medicine because he wanted to die. We will briefly analyze the contents of these records.

One of the psychiatric reports gives a history of what are termed "vague hypochondriacal complaints" over a period of twelve years. It recites the patient's inability to work, the fact that he had been only getting $37.50 a month, that he said he wanted to die because he had been suffering so much, that he had consulted twenty-five different doctors and had been in five hospitals prior to coming to Walter Reed, that he had hypochondriacal discomfort prior to the severe itching of the rectum which started in May, 1938. It closes with the following words: "Diagnosis: Psychoneurosis, hypochondriasis." This report was made after the patient had been in the hospital six months without responding to ordinary treatment.

Another report by the same neuropsychiatric consultant begins by reciting an experience told by the patient in the course of a psychiatric examination which might have contributed to a neurosis. It discloses that a year before the patient came to the hospital he had been given doped whiskey by a hitchhiker and indecently assaulted. Two weeks afterwards he noticed itching in the rectal area. This report closes with the following diagnosis:

"Neurological examination shows deep superficial reflexes normal and equal; cranial nerves intact; no disturbance in sensation other than the above described pruritus ani. At present patient shows no depression and no suicidal ideas. Appears cheerful, smiling and friendly. Has been seen by four or five psychiatrists previous to this hospitalization who said that all his troubles was in his imagination.

"Diagnostic impression: psychoneurosis, hysteria, conversion type."

No mention was made of the necessity for any special measures to prevent suicide.

■■■ We believe that the court properly rejected these hospital reports. For the purpose of proving suicidal intent they do not come within the Federal Shop Book Statute. It is clear from the legislative history of the Federal Shop Book Statute that it was intended to make it unnecessary to call as witnesses the parties who made the entries rather than to make a fundamental change in the established principles of the Shop Book exception to the hearsay rule. The report of the Senate Judiciary Committee incorporates the recommendation of the Attorney General, which reads in part as follows:

"The old common-law rule requires that every book entry be identified by the person making it. This is exceedingly difficult, if not impossible, in the case of an institution employing a large bookkeeping staff, particularly when the entries are made by machine. In a recent criminal case the Government was prevented from making out a prima-facie case by a ruling that entries in the books of a bank, made in the regular course of business, were not admissible in evidence unless the specific bookkeeper who made the entry could identify it. Since the bank employed 18 bookkeepers, and the entries were made by bookkeeping machines, this was impossible." S.Rep.No.1965, 74th Cong., 2d Sess., pp. 1, 2.

The report of the House Judiciary Committee is to the same effect. It sets out the recommendation of the Attorney General with the following introductory statement:

---

[1] Act June 20, 1936, 49 Stat. 1561, 28 U.S.C.A. § 695.

"This bill was introduced by the chairman of the committee at the request of the Attorney General. The committee concur in the opinion of the Attorney General that the proposed legislation should be enacted into law for the reasons set out in his communication and its accompanying memorandum, which are made a part of this report." H.Rep.No.2357, 74th Cong., 2d Sess., p. 1.

The remarks of members of the House Judiciary Committee explaining the bill show the same clear intent. Chairman Sumners said:

"The circuit judge, sitting as a trial judge, held that record books kept in the ordinary course, would not be admissible unless the Government produced the individual who had made the entry, who could testify with reference to the making of the entry, and so forth. Of course, according to the manner that books are now kept, many times entries are made by machines. It may be that a dozen or a half a dozen people will make entries in a set of books and nobody will be able to swear that he made a given record.

"Personally, I am ashamed to ask the House to pass this bill. This holding by the judge is ridiculous. It is more than that, but that is the situation that has developed up there. I do not understand how any judge can hold, in view of what is generally accepted, that one must bring the identical person who made the identical entry, before that entry can be introduced in evidence where the books kept are regularly and properly kept in the ordinary course of business. *But he has held it, and this bill has been introduced for the purpose of curing that situation.*" (V. 80, 5733. Apr. 20, 1936)

Congressman Duffy of the Committee made the following comment:

"* * * section 1 which enlarges the exception to the hearsay rule relating to the admissibility of business records. That section removes the obsolete common-law requirement that business entries be identified by the persons who made them. * *" Vol. 80, 9647.

 The records offered here are not the kind of entries which are admissible under the established principles of the Shop Book exception to the hearsay rule. Such records must be those which are a product of routine procedure and whose accuracy is substantially guaranteed by the fact that the record is an automatic reflection of observations.[2] This obviously excludes those which depend on opinion or conjecture. The internal check on the reliability of admissible records comes from two sources: (1) an efficient clerical system, and (2) the fact that they are the kind of observations on which competent men would not differ. As the Supreme Court recently pointed out, the test of admissibility is "the character of the records and their earmarks of reliability * * * acquired from their source and origin and the nature of their compilation."[3] Typical of such records are "payrolls, accounts receivable, accounts payable, bills of lading and the like." The Supreme Court further observed that the Federal Shop Book Statute is not one "which opens wide the door to avoidance of cross-examination * * *."[4]

 Hospital records are no different from any other kind of records kept in the regular course of business. They must be subjected to the same tests as to subject matter. Regularly recorded facts as to the patient's condition or treatment on which the observations of competent physicians would not differ are of the same character as records of sales or payrolls. Thus, a routine examination of a patient on admission to a hospital stating that he had no external injuries is admissible.[5] An observation that there was a deviation of the nasal septum is admissible.[6] Likewise, an observation that the patient was well under

2 5 Wigmore on Evidence (3rd Ed., 1940) § 1522.

3 Palmer v. Hoffman, 1943, 318 U.S. 109, 114, 63 S.Ct. 477, 480, 87 L.Ed. 645, 144 A.L.R. 719.

4 Ibid.

5 Ulm v. Moore-McCormack Lines, Inc., 2 Cir.. 1940, 115 F.2d 492, certiorari denied 313 U.S. 567, 61 S.Ct. 941, 85 L.Ed. 1525; Wickman v. Bohle, 1938, 173 Md. 694, 196 A. 326 (record stating that the patient had "a fractured right clavicle").

6 Ulm v. Moore-McCormack Lines, Inc., supra note 5; Borucki v. MacKenzie Bros. Co., 1938, 125 Conn. 92, 3 A.2d 224 (record from the laboratory giving the analysis of food from the eating of which plaintiff was made ill); Grossman v. Delaware Elect. Power Co., 1929, 4 W.W.Harr. 521, 34 Del. 521, 155 A. 806 (laboratory tests and history sheet).

the influence of alcohol.[7] But the records before us here are not of that character. The diagnosis of a psychoneurotic state involves conjecture and opinion.[8] It must, therefore, be subjected to the safeguard of cross-examination of the physician who makes it. . And accounts of selected items from interviews with patients must be subject to the same safeguard.[9]

If this were not true, a newspaper reporter's notes on an interview or observation of an accident would be admitted in evidence without calling the reporter himself. Certainly they are made in the regular course of business of running a newspaper, as that phrase is colloquially used, since they are the basis of the accounts which are afterwards printed. Newspaper reporters are certainly as skilled in observation as any other group and ordinarily have no motive to misrepresent. Corporations today keep a vast mass of records, all of which are used as the basis for management action. All such records would be admissible in evidence if the kind of psychiatric diagnosis and hearsay accounts offered here were ruled admissible. A few hypothetical cases will illustrate the distortion of the common law rule which would occur if the contentions of appellant regarding the admissibility of the above described psychiatric diagnosis and report of conversations were upheld.

(1) A corporation is engaged in taking a nationwide poll as to the number of members of the Communist party. In the regular course of that business its employee interviews X, Y and Z. The interviewer reports that X, Y and Z are Communists, giving excerpts from the conversations to support this opinion. The report would be admissible in subsequent litigation to make a prima facie case that X, Y and Z are Communists [10]

(2) A research foundation is engaged in determining the amount of insanity in Washington, D. C. A trained psychiatrist sends in a record that John Doe is insane. Since this record was made in the regular course of the business of the research foundation it would be admissible without calling the interviewer in order to make a prima facie case in a subsequent contest of John Doe's will.

(3) A large corporation employs a firm of efficiency engineers to investigate its personnel. In the regular course of that investigation the report is made that employee X is willfully insubordinate, supported by excerpts from his conversation. The efficiency firm has no interest in or probable cause for litigation with X. The report, therefore, would be admissible against X in a suit for breach of his employment contract without calling the man who made it.

These are extreme cases but there seems no logical escape from the above results if the conjectures and conversations contained in the hospital records which I have described above are held admissible.

It is no reflection upon the profession of psychiatry to say that it necessarily deals in a field of conjecture. Even in the diagnosis of actual insanity, cases are rare in which trained psychiatric witnesses do not come to opposite conclusions. The opinions here relate to neurosis, a condition short of insanity, on which there are countless theories and infinite diagnostic possibilities. It is difficult to conceive of records in which the right of cross-examination is more important than the conjec-

---

[7] Reed v. Order of United Commercial Travelers of America, 2 Cir., 1941, 123 F. 2d 252; Sadjak v. Parker-Wolverine Co., 1937, 281 Mich. 84, 274 N.W. 719; Adler v. N. Y. Life Ins. Co., 8 Cir., 1929, 33 F.2d 827 (record admitted to show that at the time of filing application plaintiff had ulcer, chronic prostatitis and seminal vesiculitis); Prudential Ins. Co. of America v. Saxe, 1943, 77 U.S.App.D.C. 144, 134 F.2d 16, certiorari denied 1943, 319 U.S. 745, 63 S.Ct. 1033, 87 L.Ed. 1701.

[8] Ulm v. Moore-McCormack Lines, Inc., supra note 5, 115 F.2d at page 495: "But whatever should be the judicial attitude toward this statute, we do not think the cited New York cases are in point on the immediate issue here. They did not involve the problem of identification, but only whether or not *opinion statements of a doctor* and of a policeman contained in official or business records were admissible. Here the records were claimed primarily to show direct observations made by attending physicians, not entries of opinions." (Emphasis supplied.)

[9] Cf. Cottrell v. Prudential Ins. Co. of America, 1940, 260 App.Div. 986, 23 N. Y.S.2d 335.

[10] Such evidence might be used in a proceeding for the cancellation of a naturalization certificate. See Schneiderman v. United States, 1943, 320 U.S. 118, 63 S. Ct. 1333, 87 L.Ed. 1796.

tures of a psychiatrist on a psychoneurotic condition.[11]

The drastic impairment of the right of cross-examination resulting from the admission of this type of unsworn observation and opinion evidence will be recognized by anyone familiar with the psychology of a jury trial. The unsworn psychiatric diagnosis would be introduced, with appropriate fanfare as to the distinguished character of the alienist who made it, but who is not called as a witness. The opposing party might have plenty of data to shake this testimony on cross-examination, yet he would have to remain silent while a strong prima facie case is made against him. The risk of perjury would be neatly avoided because the real witness is not sworn.

It is true that after the party who introduced such opinions has closed his case the opposing party would have a chance to rebut them. But the disadvantageous position in which the denial of his right of cross-examination would place him is obvious to any trial lawyer. A period of time has gone by; an impression on the jury has been made. The expensive and sometimes impossible burden of hunting out and producing the psychiatrist who gave the opinion is unjustly shifted to the party against whom the opinion is used. And after he catches and produces the psychiatrist he must offer him as his own witness—a disadvantage only slightly limited by the fact that the trial court may in its discretion allow him to impeach his own witness. Only a lawyer without trial experience would suggest that the limited right to impeach

one's own witness is the equivalent of that right to immediate cross-examination which has always been regarded as the greatest safeguard of American trial procedure.

These considerations apply with equal force to the hospital records offered below which disclose that the patient said he took an overdose of codein and aspirin because he wanted to die. This remark was retold by the nurse to the attending physician and recorded by him. It is contradicted by another conversation with the same physician, also part of the record, in which the patient said he only wanted to get relief from itching. The record that the patient took an overdose was a routine entry of a fact on which observers would not differ. But the excerpts from the patient's conversation reported by a nurse are no different from a newspaper reporter's account of an interview. They are made in the regular course of business in the colloquial sense but not as that term is intended for use by statute. The consequence of the position taken by Judge Edgerton would be that the mere absence of an apparent motive to misrepresent makes admissible any and all business records which are regularly kept regardless of their character. This, we believe, is a legislative change in the Shop Book Rule which is not permitted by the statute. Of course it is true that in an occasional case the *presence* of an unusually strong motive to misrepresent may exclude an entry otherwise admissible under the rule.[12] But this limitation on the application of the rule does not mean that the absence of motive to

11 Of course if the fact that a patient had been treated for a psychoneurotic condition became relevant to prove some issue in the case other than the truth of the diagnosis the record would be admissible to show that such treatment had taken place. For example, in the recent case of Becker v. United States, 7 Cir., 1944, 145 F.2d 171, the issue was whether a finding of permanent and total disability caused by insanity was supported by the evidence. Nearly all the evidence of disability was direct testimony of physicians. To corroborate that direct testimony hospital records were introduced to show that the insured had been discharged from an evacuation hospital with a diagnosis of acute rheumatism; that the next month the insured was hospitalized again because of his mental condition; that he was shipped back to the United States in a cage with

other mental patients and a tag placed upon him which read "Mental Case"; that on his return to this country his condition was diagnosed as "Psychoneurosis, Hysteria". It is apparent that these records are relevant to show that the insured was disabled during the period of confinement regardless of the accuracy of the diagnosis. These records corroborate the direct testimony of the physicians that he continued to be under the disability after his discharge from the hospital. But the case is hardly an authority for admitting a psychiatric diagnosis as a substitute for direct testimony as to the character of the insanity in inducing a tendency to suicide. See also People v. Kohlmeyer, 1940, 284 N.Y. 366, 31 N.E.2d 490.

12 Cf. Estate of William Buckminster v. Com'r of Internal Revenue, 2 Cir., 147 F. 2d 331.

misrepresent is the basis for admissibility.[13] For example, it would scarcely be argued that a bank ledger, kept in the regular course of business, would become inadmissible to show the state of a customer's account because he was engaged in a dispute with the bank as to the amount of his balance. Books of account are ordinarily kept for the very purpose of having proof in case litigation develops. To introduce the absence of motive to misrepresent, as a test of admissibility, would be to completely change the rationale of the Shop Book Rule. For example, an entry of a credit manager that he had learned from conversation with a customer that he owed $10,000 would go in if the manager had no motive to misrepresent.

In other words, it is not the absence of a motive to misrepresent which is the basis of the Shop Book exception to the hearsay rule. Purely clerical entries come within the rule regardless of the fact that the party making them has an interest in what they may be used to prove. Conversely where the accuracy of the entries depends on opinion, conjecture or judgment in selecting the particular entries from a larger mass of data which some other observer might consider equally relevant, the entries are not within the Rule regardless of motive.

The reasons for the Shop Book Rule are well stated by Wigmore [14] to be (1) that the influence of habit may be relied on, by very inertia to prevent casual inaccuracies; (2) that errors or misstatements in a regular course of business transactions are easily detected and misstatements cannot safely be made if at all except by a systematic and comprehensive plan of falsification; (3) that since the entrant is under a duty to an employer or other superior there is a risk of censure or disgrace from the superior in case of inaccuracy. The records of opinion and hearsay accounts of conversations involved in this case fail to satisfy any one of these tests. Nothing in the words of the Shop Book Statute itself or its legislative history justifies overturning these established principles of evidence. It is true that in Palmer v. Hoffman, supra, the Supreme Court spoke of the opportunity for manufacturing evidence which would exist if an engineer's statement, made in the course of a company investigation of an accident, was held admissible in a suit based on that accident. But this was not the sole ground for the decision. The Court's rule as to admissibility is clearly based upon the subject matter of the entries, their routine character, and their similarity to payrolls and the like. The opinion is not intended to "open the door to avoidance of cross-examination" on the mass of opinion, conjecture and observation now regularly reported in the course of modern business.

Today every great corporation is making thousands of records, obtaining credit information, making psychological examinations of its employees, hiring efficiency experts and recording the activities of its personnel. To admit this potpourri on the sole tests of regular recording and absence of motive to misrepresent would be a drastic impairment of the right of cross-examination. In a criminal case it is doubtful whether such a deprivation of the right of the accused to be confronted with the witnesses against him would be constitutional.

The entire hospital records offered in this case are not before us. It may be that some of the entries are admissible. The test should be whether they are records of a readily observable condition of the patient or of his treatment. There is no magic in the word diagnosis which makes everything which can be included in that term admissible. Some diagnoses are a matter of observation, others are a matter of judgment, still others a matter of pure conjecture. The admissibility of records of such diagnoses must depend upon their character. Certainly the hearsay accounts and the psychoneurotic conjectures contained in these records cannot be received without cross-examination as proof of a tendency to commit suicide.

Reversed and remanded.

EDGERTON, Associate Justice (dissenting in part).

The insurance company offered the following hospital records, with proof that

---

[13] Wigmore, op. cite. supra note 2, § 1527: "It is often added that there must have been no *motive to misrepresent*. This does not mean that the offeror must show an absence of all such motives; but merely that if the existence of a fairly positive counter-motive to misrepresent is made to appear in a particular instance the entry would be excluded. This limitation is a fair one, provided it be not interpreted with over-strictness."

[14] Wigmore, op. cite. supra note 2.

they were made in the regular course of business:[1] (1) A statement of history, etc., taken by an attending physician from the insured when he was admitted to the hospital; (2) a diagnosis of his condition at that time; (3) reports of operations which he underwent and other treatment which he received in the hospital; (4) reports of consultations in which he discussed his history and his depressed state of mind and gave conflicting explanations, one of them suicidal, of his taking a large dose of codein and aspirin; (5) reports of psychiatric examinations, one of which included a diagnosis of "psychoneurosis, hypochondriasis"; and (6) the proceedings and findings of the Board of Officers of the hospital concerning the cause of death. The trial court rejected all of these records. The beneficiary recovered double indemnity on the theory that death was accidental.

Appellant, the insurance company, now concedes that the rejection of the sixth item was correct. That question, therefore, is not before us. Some of the disputed items are quoted in the transcript; others are merely described. In my opinion the quoted items should have been admitted. So far as the character of the others can be judged from their descriptions, I think they also should have been admitted.

The federal Shop Book Rule, an Act of Congress, provides: "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or with-

in a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation, and calling of every kind." [2]

The Shop Book Rule is an exception to the hearsay rule. Its purpose is to avoid the necessity of identifying, locating and calling numerous witnesses. Its chief drawback is that it prevents the opposing party from cross-examining them. The Supreme Court has recently stated its purpose and its principle. An enterprise, the Court said in Palmer v. Hoffman, commonly "entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation. Though such books and records were considered reliable and trustworthy for major decisions in the industrial and business world, their use in litigation was greatly circumscribed or hedged about by the hearsay rule—restrictions which greatly increased the time and cost of making the proof where those who made the records were numerous. * * * It was that problem which started the movement towards adoption of legislation embodying the principles of the present Act. * * * And the legislative history of the Act indicates the same purpose." The basis of the Rule is "the probability of trustworthiness of records because they were routine reflections of the day to day operations of a business. * * * 'Regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." [3]

The routine records of hospitals are within the literal meaning of the Rule. That they are within the intent of Congress is shown by the fact that two of the cases cited in the committee reports involve such records.[4] They are also within the princi-

[1] There was no contrary testimony. No question was raised regarding the time within which the regular course of business required the entries to be made. In view of the custom of hospitals, the standing of Walter Reed Hospital, and the absence of any suggestion to the contrary, we may infer that the regular course required the entries to be made within a reasonable time.

[2] 49 Stat. 1561, 28 U.S.C.A. § 695.

[3] Palmer v. Hoffman, 318 U.S. 109, 111–115, 63 S.Ct. 477, 479, 87 L.Ed. 645, 144 A.L.R. 719.

[4] 74th Cong., 2nd session, S. R. No. 1965; 74th Cong., 2nd session, H. R. No. 2357. The cases referred to are Grossman v. Delaware Electric Power Co., 4 W.W. Harr. 521, 34 Del. 521, 155 A. 806, and St. Louis v. Boston & Maine R. R., 83 N. H. 538, 145 A. 263.

ple and purpose of the Rule as explained by the Supreme Court in the Palmer case. The business of hospitals is caring for patients. By its "inherent nature" this business "entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation." "The methods systematically employed" for its conduct include the making and keeping of records of histories, diagnosis and treatment. These are "routine reflections of the day to day operations" of the hospital's business. And, as Wigmore points out, some of the reasons for the admission of records in evidence apply with special force to the records of hospitals. "The calling of all the individual attendant physicians and nurses who have cooperated to make the record even of a single patient would be a serious interference with convenience of hospital management. There is a Circumstantial Guarantee of Trustworthiness * * *; for the records are made and relied upon in affairs of life and death." It may be added that the members of a hospital staff are persons of more than average responsibility; and that they have two strong motives, one humanitarian and the other professional, for correctness, and usually no motive for fabrication. Dean Wigmore continues: "Moreover, amidst the day-to-day details of scores of hospital cases, the physicians and nurses can ordinarily recall from actual memory few or none of the specific data entered; they themselves rely upon the record of their own action; hence, to call them to the stand would ordinarily add little or nothing to the information furnished by the record alone. The occasional errors and omissions, occurring in the routine work of a large staff, are no more an obstacle to the general trustworthiness of such records than are the errors of witnesses on the stand." Statutes in a number of states have specifically authorized the admission of hospital records.[5]

The Courts of Appeals of both the Second and Third Circuits have held that hospital records are admissible under the federal Shop Book Rule.[6] In the Seventh Circuit, and in this jurisdiction, they have been admitted without objection.[7] Moreover, the Rule was copied almost verbatim from a so-called model act,[8] and states which have adopted that act have repeatedly applied it to hospital records.[9]

The Rule covers records of an "act, transaction, occurrence, or event." Any development in, and any manifestation of, the patient's mental or physical condition is an occurrence or event. Observation, diagnosis, and treatment also are acts, occurrences, or events. Accordingly records of condition, diagnosis and treatment, made in the regular course of business, when the regular course requires them to be made within a reasonable time after the event, are admissible under the Rule so far as they are relevant. Usually, and in the present case, diagnosis involves opinion. But even before the Shop Book Rule was enacted this court had held that records of the "opinions" as well as the "observations" of medical officers were admissible.[10] More recently, hospital records of diagnosis have been admitted without objection.[11] The

[5] Wigmore on Evidence, 3d ed., § 1707. Cf. §§ 1520, 1530, 1530a, 1639. The Maryland statute e. g., provides that, in civil cases, transcripts of the records of the Maryland Tuberculosis Sanitarium or any of its branches "shall be competent evidence of the medical history of any individual who heretofore has been, or hereafter may be, a patient therein." Ann. Code Md., 1939, art. 35, § 13.

[6] Ulm v. Moore-McCormack Lines, Inc., 2 Cir., 115 F.2d 492; Id., 2 Cir., 117 F.2d 222 ("clinical records" etc.); Reed v. Order of United Commercial Travelers of America, 2 Cir., 123 F.2d 252, 253 ("well under influence of alcohol"); Pollack v. Metropolitan Life Ins. Co., 3 Cir., 138 F.2d 123 (patient's statement of age); Estate of William Buckminster v. Com'r of Internal Revenue, 2 Cir., 147 F.2d 331 ("cerebral hemorrhage"); Norwood v. Great American Indemnity Co., 3 Cir., 146 F.2d 797 ("conflicting" autopsy reports).

[7] Becker v. United States, 7 Cir., 145 F.2d 171 ("Psychoneurosis Hysteria"); Prudential Insurance Co. v. Saxe, 77 U.S.App.D.C. 144, 134 F.2d 16.

[8] 5 Wigmore on Evidence, § 1520.

[9] Borucki v. MacKenzie Bros., 125 Conn. 92, 3 A.2d 224 ("treatment, * * * condition" etc.); Wickman v. Bohle, 173 Md. 694, 196 A. 326, 329 ("fractured right clavicle"); Gile v. Hudnutt, 279 Mich. 358, 272 N.W. 706; People v. Kohlmeyer, 284 N.Y. 366, 31 N.E.2d 490, 491 ("included diagnoses of manic depressive insanity"); Conlon v. John Hancock Mutual Life Ins., 56 R.I. 88, 183 A. 850, 851, ("moderately advanced tuberculosis").

[10] United States v. Balance, 61 App.D.C. 226, 59 F.2d 1040, 1042.

[11] Prudential Insurance Co. v. Saxe, 77 U.S.App.D.C. 144, 134 F.2d 16.

opinion of a physician or other expert may be given on the witness stand when it is helpful to a jury's understanding of technical facts. I think the Shop Book Rule makes a physician's recorded diagnosis similarly admissible. The broad language of the Rule requires this result; so does the convenience of hospitals and of litigants; and the fact that recorded diagnoses are "systematically employed for the conduct of the business" [12] and "relied upon in affairs of life and death" establishes their relative trustworthiness. Relative trustworthiness is as much as the Rule contemplates or any human testimony possesses. Most of the cases which we have cited involved diagnosis; some of them involved psychiatric diagnosis.[13]

It is of course true that psychiatric diagnosis is subject to error, that cross-examination is an invaluable aid in exposing error, and that the Shop Book Rule avoids cross-examination. But the argument that records of psychiatric diagnosis should therefore be excluded from the operation of the Rule proves too much. For records of the simplest observations of the most objective facts, which are conceded to be admissible under the Rule, are also subject to errors which cross-examination, if it were available, might expose. The alleged observer may have had no opportunity, or no adequate opportunity, to observe, or he may have made no effort to observe, or he may have made only a casual and ineffective effort. He may have been either permanently or temporarily incapable of accurate observation. He may have observed one thing and either carelessly or intentionally recorded a different thing. None of these circumstances is likely to appear upon the record. Any of them might be disclosed by cross-examination. The Shop Book Rule, by denying opportunity for cross-examination, imposes no greater disadvantage on the litigant who is adversely affected by a record of a psychiatric diagnosis than upon a litigant who is adversely affected by a record of the con-

tents of a freight car. Rather, the disadvantage is likely to be less, for counsel are commonly less competent to attack expert testimony than lay testimony, and the expert witness is commonly more competent than the layman to defend himself.

When the Rule admits in evidence the record of an "act, transaction, occurrence, or event" it does not do so for every purpose. It admits the record "as evidence of said act, transaction, occurrence, or event." Since the making of a statement is an act or event, a record that the patient made a certain statement is admissible as proof that he did so if his doing so is relevant, if the record is made in regular course, and if the regular course requires the record to be made within a reasonable time. The mere making of any statement which tends to indicate a depressed frame of mind is relevant to the issue of suicide. Whether a record of a patient's statements may be used not only as proof that he made them but also as proof that they are true [14] is a complex question. The Rule permits proof of an event, etc., by its record only when the regular course of business requires the record to be made within a reasonable time after the event. It may be the regular course of the hospital's business to record certain types of statements within a reasonable time after the patient makes them but, with the exception of events which occur after he enters the hospital, it can hardly be the regular course of business to record the facts which he states within a reasonable time after they occur. Thus it may be the regular course to ask a disabled man what caused his disability, and to record his answer, at the earliest opportunity, but the time of the recording depends upon the time of the statement and not upon the time of the injury. That may be recent or it may be very remote. It follows that the Rule does not, by itself, permit use of the record of the patient's statement of what occurred before he entered the hospital to prove the facts which he stated. But the Rule does permit use of the record to prove

[12] Palmer v. Hoffman, 318 U.S. 109, 115, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L. R. 719.

[13] Notes 6, 7, and 9 supra. Contra, Lykes Bros. S. S. Co. v. Grubaugh, 5 Cir., 128 F.2d 387.

I think this court is in error in citing Wigmore, § 1522, as supporting its view that the Shop Book Rule admits only "observations which do not depend on opinion * * *."

[14] Pollack v. Metropolitan Life Ins. Co., 3 Cir., 138 F.2d 123, 128; Wickman v. Bohle, 173 Md. 694, 196 A. 326. Cf. Hunter v. Derby Foods, Inc., 2 Cir., 110 F.2d 970, 133 A.L.R. 255; Contra, Sadjak v. Parker-Wolverine Co., 281 Mich. 84, 274 N.W. 719; Harrison v. Lorenz, 303 Mich. 382, 6 N.W.2d 554; Geroeami v. Fancy Fruit & Produce Co., 249 App.Div. 221, 291 N.Y.S. 837.

310

that he made a statement; and the statement should be accepted for what it may be worth in proof of relevant facts stated if either (1) they occurred after he entered the hospital, or (2) by virtue of some independent exception to the hearsay rule, such as statements of family history or of mental or physical condition,[15] oral testimony that the patient made the same statement would be admissible in proof of the same facts.[16] With respect to his pre-hospital history the Rule alone does no more, but also no less, than make the authenticated record an acceptable form of testimony that the patient's statement was made.

Before any writing is admitted in evidence under the Shop Book Rule there are three preliminary questions of fact to be decided. (1) Was the writing "made as a memorandum or record of any act, transaction, occurrence or event"? (2) Was it "made in the regular course of any business"? (3) Was it the regular course to make the record "within a reasonable time"? Like other preliminary questions of fact upon which the admissibility of evidence depends, these are questions for the judge. In interpreting and deciding them he has a considerable power to prevent abuse of the Rule. The recent case of Palmer v. Hoffman illustrates this. There the Supreme Court found that the Rule did not admit a railroad engineer's reports of accidents, because such reports "are not for the systematic conduct of the enterprise as a railroad business. * * * Their primary utility is in litigating, not in railroading." [17] Since they are primarily intended for external and defensive use, they are less trustworthy than reports which are primarily intended to be relied upon as the basis of action in the internal business of the enterprise. Possibly something of the same sort might be said of the records of the Board of Officers, which are not in issue, in the present case. But nothing of the sort could be said of the records of history, diagnosis and treatment, the admissibility of which is the only question

before us. These records were not made for external or defensive use. They were made to be relied upon in the treatment of a patient.

It is true that in declining, in the Palmer case, to admit a report which was made for defensive purposes the Supreme Court said: "Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication." [18] But that language is irrelevant here, both because the records here in dispute were not made for defensive purposes and because the admission of these records does not depend on implication. They are (1) within the express language of the Shop Book Rule since they were made in the regular course of the hospital's business, in the strictest sense, and it was the regular course to make them within a reasonable time.[19] They are (2) within the Rule as interpreted in the Palmer case, since they are routine records of day to day operations and made to be relied upon in the internal conduct of the enterprise. They are to the business of a hospital what "bills of lading and the like" [20] are to the business of a railroad. They are (3) within the principle and purpose of the Rule since they are trustworthy and since their admission avoids the necessity of calling many witnesses. They are (4) within the established judicial interpretation of the Rule and of the model act on which it is based. We need not concern ourselves with hypothetical records which might meet some of these tests but would fail to meet others. We need not consider whether Congress had any intention of admitting the records which are made by newspaper men, credit men, or investigators for the ultimate purpose of selling news or views to persons outside the business organizations to which the men belong.[21] It might well be contended that the Rule admits only writings which are incidental to the internal operation of a business and does not admit writings which are the very subject-matter of a business. In the light of the Palmer case, particularly, it might well be contended that

[15] Cf. Meaney v. United States, 2 Cir., 112 F.2d 538, 130 A.L.R. 973; Wigmore, Evidence, 3d ed., § 1714.

[16] Cf. Magruder, J., concurring in Pollack v. Metropolitan Life Ins. Co., supra; Hale, Hospital Records as Evidence, 14 So.Cal.L.R. 99, 106.

[17] 318 U.S. 109, 114, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

[18] 318 U.S. 109, 114, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

[19] Note 1 supra.

[20] Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 481, 87 L.Ed. 645, 144 A.L.R. 719.

[21] The reports of the committees of Congress cite no cases of any such character.

the Rule excludes practically all records which are ultimately intended for external use. But records which meet all possible tests are not to be excluded, in the teeth of the statute, in order to preserve intact the right of cross-examination as it existed at common law. To preserve that right intact would repeal the statute; for any application of the Shop Book Rule, as of any other exception to the hearsay rule, by admitting hearsay necessarily avoids cross-examination.